PEOPLE v BULGER

Docket No. 112694. Argued October 14, 1999 (Calendar No. 9). Decided July 18, 2000.

Gregory R. Bulger pleaded guilty in the Saginaw Circuit Court of possession with intent to deliver less than fifty grams of cocaine and possession of marijuana. The court, Leopold P. Borrello, J., imposed sentence. Thereafter, the defendant requested that the trial court appoint counsel to prepare his application for leave to appeal. The court denied the request. The defendant, along with several similarly situated defendants, then sought superintending control in the Supreme Court, which dismissed the complaint, but granted the petitioners twenty-one days in which to move for appointed appellate counsel in the trial court, and further ordered the trial court to appoint counsel to argue the motion. The trial court appointed counsel to represent the defendant for purposes of his motion for the appointment of appellate counsel and any resulting appeal. Following argument, the court denied the motion. The court reasoned that appointing counsel for every indigent defendant who seeks leave to appeal a plea-based conviction would defeat the purpose of Proposal B, which amended Const 1963, art 1, § 20, to reduce costs and burdens on the criminal justice system arising from guilty-plea appeals. It also noted that the need for counsel is less compelling in an appeal from a plea-based conviction, as compared to a trial, because it is easier to identify errors, given the relative simplicity of the proceedings. The court further concluded that appointment of counsel was not constitutionally required. The Court of Appeals, MARKMAN, P.J., and D. E. HOLBROOK JR., and WHITBECK, JJ., in an unpublished order, in lieu of granting leave, remanded the case to the trial court for reconsideration in light of *People v Najar*, 229 Mich App 393 (1998) (Docket No. 209031). The defendant appeals.

In an opinion by Justice CORRIGAN, joined by Chief Justice WEAVER, and Justices TAYLOR and YOUNG, the Supreme Court *held*:

Neither the state nor the federal constitution requires the appointment of counsel under the circumstances of this case.

1. Following the amendment of Const 1963, art 1, § 20 by the ratification of Proposal B, indigent defendants who plead guilty or

nolo contendere are no longer entitled to appeal their convictions as a matter of right. Rather, they must apply for leave to appeal. A defendant is entitled to reasonable assistance necessary to perfect and prosecute an appeal only when it is provided by law and the trial court so orders. Thus, the defendant in this case has no right to appointed counsel under the Michigan Constitution because the appointment of appellate counsel for an indigent defendant applying for leave to appeal from a plea-based conviction was not provided by law at any relevant time.

2. The Supreme Court has consistently held that use of the phrase "provided by law" in the Michigan Constitution contemplates legislative action. Where action by this Court pursuant to its rulemaking powers is contemplated, the constitution explicitly so provides. Given the use of the phrase in art 1, § 20, a defendant is entitled to the appointment of counsel only to the extent that such assistance is legislatively required. The Supreme Court cannot use its rulemaking powers to provide for appointed appellate counsel in the absence of legislative action.

3. The federal constitution does not require the states to provide any appeal whatsoever to criminal defendants. No authority recognizes the right to appeal a plea of guilty as a fundamental right. Under the due process-equal protection test of *Ross v Moffitt*, 417 US 600 (1974), Michigan's scheme gives guilty-pleading defendants a fair opportunity to have their claims heard in appellate courts. Further, the state's current arrangements for inmate access to the courts satisfy the so-called right to meaningful access. Thus, Michigan's scheme does not offend the Fourteenth Amendment.

4. Appeals from plea-based convictions and appeals from convictions obtained following trials are fundamentally different. A defendant who tenders a plea has admitted guilt of the offense in open court. A guilty plea represents a break in the chain of events that has preceded it in the criminal process. A criminal defendant may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred before the entry of the guilty plea. Further, the state has a fundamental interest in the finality of guilty pleas. A guilty plea evidences a defendant's desire to terminate the prosecution. Thus, a defendant who concedes his guilt has acceded to the state's fundamental interest in finality. Plea proceedings are also shorter, simpler, and more routine than trials. The record most often consists of the factual basis for the plea that is provided to the trial court. In contrast with trials, there is less danger in plea cases that the record will be so unclear or the errors so hidden that the defendant's appeal will be reduced to a meaning-

less ritual. Also, a concession of guilt limits considerably the potential issues that can be raised on appeal.

5. Michigan court rules require trial counsel to assist the defendant in organizing and presenting to the trial court any potential appellate issues that warrant preservation. Accordingly, a pro se defendant seeking discretionary review will have the benefit of a transcript, trial counsel's framing of the issues in the motion to withdraw, and the trial court's ruling on the motion. Further, prison inmates filing discretionary applications will have the same access to law libraries, paralegal assistance, and staff attorneys that Michigan provides to them in other postconviction proceedings. The fact that a particular service might be of benefit to an indigent defendant does not mean that it is constitutionally required. The Fourteenth Amendment does not require absolute equality or precisely equal advantages, nor does it require the state to equalize economic conditions.

Vacated and remanded.

Justice CAVANAGH, joined by Justice KELLY, dissenting, stated that as a matter of federal constitutional law, indigent defendants who have pleaded guilty must have counsel appointed to assist them on appeal by leave, their first and only appeal on the merits.

In *Griffin v Illinois*, 351 US 12 (1956), the United States Supreme Court held that a state may not grant appellate review in a way that discriminates because of poverty or financial status. It passed directly on the right to appointed counsel on appeal in *Douglas v California*, 372 US 353 (1963), concluding that, where the merits of the one and only appeal an indigent has as of right are decided without benefit of counsel, an unconstitutional line has been drawn between rich and poor. In *Ross*, the Court noted that, rather than providing an absolute rule, *Douglas* offers a scale against which other procedures can be measured. The focus of *Ross* was whether the materials available to an indigent defendant, without the basis of counsel, would be adequate to allow a court to determine whether to grant further review.

In this case, an indigent defendant is faced, by law, with only the ability to apply for leave to the Court of Appeals, and is required to do so without the benefit of appointed counsel. The Court of Appeals would have no brief, or even an identification of issues, by any counsel for the defendant, and nothing in the way of an opinion of the court below on any substantive matters. Rather, it would have only the record before it, along with whatever submissions the defendant might make pro se. Thus, it can be concluded that the instant scheme is invalid under *Ross* by virtue of its failure to

separate itself by any meaningful degree from the gulf that existed between moneyed and indigent defendants in *Douglas*.

A correct adjudication of guilt involves more than just an admission of guilt. Michigan has long recognized that a mere admission of guilt, even if accompanied by an absolute and all-knowing certainty, is but one component of a correct adjudication of guilt under our system. Even though an indigent defendant pleads guilty, constitutional defects that are irrelevant to factual guilt still may be appealed, as may sentencing decisions. Nonetheless, the majority concludes that guilty pleas are so simple, no counsel will ever be necessary for an indigent defendant who wants to appeal. Indigent Proposal B defendants will have nothing comparable to the tools the defendant had in *Ross*, leaving them to have only a meaningless ritual rather than a meaningful appeal. By denying counsel to indigent defendants, the majority commits structural error, which presumptively results in prejudice.

Justice MARKMAN took no part in the decision of this case.

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Henry G. Marsh*, Special Prosecutor, for the people.

State Appellate Defender (by *David A. Moran*) for the defendant-appellant.

Amici Curiae:

*Terence R. Flanagan* for Michigan Appellate Assigned Counsel System, Michigan Defender Offices, Criminal Defense Attorneys of Michigan, and American Civil Liberties Union.

*Kenneth M. Malkin* for Michigan Defender Offices, Bay County Office of Criminal Defense, *Elizabeth L. Church* for Chippewa County Public Defender Office, *Richard E. Hillary* for Kent County Office of the Defender, *Michael H. Lamble* for Twenty-Sixth Judicial Circuit Office of Public Advocacy, *Lloyd E. Powell* for Washtenaw County Public Defender, and

*Thomas M. Harp* for Wayne County Legal Aid and Defender Association of Detroit.

*Ronald J. Bretz* for American Civil Liberties Union and Criminal Defense Attorneys of Michigan.

*Michael J. Steinberg* for American Civil Liberties Union.

*Barbara R. Levine* for Michigan Appellate Assigned Counsel System.

*Brian L. Mackie*, President, *Gary L. Walker*, Marquette County Prosecuting Attorney, and *Terrence E. Dean*, Appellate Counsel, for Prosecuting Attorneys Association of Michigan.

*John D. O'Hair*, Prosecuting Attorney, and *Timothy A. Baughman*, Chief, Research, Training and Appeals, for Wayne County Prosecutor's Office.

*Stacy Hawkins*, Interested Person.

CORRIGAN, J. We granted leave in this case to determine whether an indigent defendant is entitled to the appointment of appellate counsel at public expense when applying for leave to appeal a plea-based conviction. We hold that neither the state nor the federal constitution requires the appointment of counsel under these circumstances. Under our federalist scheme of government, Michigan remains free to decide the conditions under which appellate counsel will be provided where our state constitution commands that the mechanism of appellate review is discretionary. Const 1963, art 1, § 20.

Accordingly, we vacate the order of the Court of Appeals that remanded this case to the trial court for

reconsideration in light of *People v Najar*, 229 Mich App 393; 581 NW2d 302 (1998), reinstate the trial court's order denying defendant's motion for appointment of appellate counsel, and remand this case to the trial court so that defendant may pursue his application for leave to appeal his convictions.

### I. UNDERLYING FACTS AND PROCEDURAL HISTORY

Defendant pleaded guilty in Saginaw Circuit Court on July 10, 1995, to possession with intent to deliver less than fifty grams of cocaine, MCL 333.7401(2)(a)(iv); MSA 14.15(7401)(2)(a)(iv), and possession of marijuana, MCL 333.7403(2)(d); MSA 14.15(7403)(2)(d). The trial court sentenced him to concurrent terms of imprisonment of six to twenty years for the cocaine conviction and one hundred forty-five days for the marijuana conviction. Defendant subsequently requested that the trial court appoint counsel to prepare his application for leave to appeal to the Court of Appeals. The trial court denied defendant's request. Defendant, along with several similarly situated defendants, then sought superintending control in this Court. This Court dismissed the complaint, but granted defendant and the other petitioners twenty-one days in which to move for appointed appellate counsel in the trial court. This Court further ordered the trial court to appoint counsel to argue the motion.

Defendant thereafter moved for the appointment of appellate counsel. The trial court appointed counsel to represent defendant for purposes of the motion and any resulting appeal. Following argument, the trial court denied defendant's motion in an opinion and order. The court noted that, in November 1994,

the people of Michigan ratified Proposal B, which amended Const 1963, art 1, § 20 to state that "as provided by law an appeal by an accused who pleads guilty or nolo contendere shall be by leave of the court,"[1] but left the provision regarding the appointment of counsel unchanged. The trial court further observed that, following the approval of Proposal B, this Court amended MCR 6.425(F)(1)(c) to provide that "[i]n a case involving a conviction following a plea of guilty or nolo contendere the court should liberally grant the request [for appointment of an attorney] if it is filed within 42 days after sentencing."

In denying counsel, the trial court reasoned that appointing counsel for every indigent defendant who seeks leave to appeal a plea-based conviction would defeat the purpose of Proposal B, which was to reduce costs and burdens on the criminal justice system arising from guilty plea appeals. It also observed that the need for counsel is less compelling in applications from plea-based convictions because the simplicity of the proceedings makes the process of identifying errors easier. The court further concluded that appointment of counsel was not constitutionally required. The court then reviewed the plea and sentencing proceedings in this case and, noting the lack of apparent error, denied defendant's request for counsel.

Defendant applied for leave to appeal the denial of his motion for appointed counsel. In lieu of granting leave, the Court of Appeals remanded the case to the

---

[1] The Legislature subsequently enacted MCL 770.3(1)(e); MSA 28.1100(1)(e), providing that appeals from plea-based convictions shall be by application for leave to appeal.

trial court for reconsideration in light of *Najar,* *supra.* The Court stated:

> *Najar* neither requires the appointment of appellate counsel under MCR 6.425(F)(1)(c) in every case, nor forecloses the ability of a trial court to exercise its discretion to appoint counsel under MCR 6.425(F)(1)(c) in any case in which it concludes that the defendant is in need of assistance to pursue an application for leave to appeal. [Unpublished order, entered July 21, 1998 (Docket No. 209031).]

In *Najar,* the Court of Appeals addressed the question presented in the instant case. The Court reasoned that while Const 1963, art 1, § 20 entitles a defendant to "reasonable assistance in perfecting and prosecuting an appeal[,] . . . [a]n application for leave to bring an appeal is plainly and simply not an appeal." *Najar, supra* at 398. The Court further concluded that neither the state nor the federal constitution guarantees a right to appointed counsel to pursue an application for leave to appeal. Finally, the Court considered the language of MCR 6.425(F)(1)(c), and concluded that the trial court has discretion to appoint counsel, but should appoint counsel when a defendant

> raises any issue other than one relating to (1) the facial regularity of the plea-taking procedure, (2) the trial court's adherence to a sentencing agreement, (3) a plain correction of clerical error in court documents, such as a misspelling or a mathematical miscalculation, or (4) other instances absolutely devoid of merit . . . . [*Najar, supra* at 403-404.]

Following the order of the Court of Appeals remanding this case to the trial court for reconsideration in light of *Najar,* defendant sought leave to

appeal to this Court, which we granted. 459 Mich 873 (1998).

## II. HISTORY OF RELEVANT STATE AUTHORITIES

Before the ratification of the 1963 Michigan Constitution, Const 1908, art 2, § 19 provided that an accused was entitled "in courts of record, when the trial court shall so order, to have such reasonable assistance as may be necessary to perfect and prosecute an appeal." Criminal defendants, however, were not entitled to an appeal as of right. Const 1963, art 1, § 20, provided before the adoption of Proposal B in 1994 that a defendant had "an appeal as a matter of right; and *as provided by law*, when the trial court so orders, to have such reasonable assistance as may be necessary to perfect and prosecute an appeal." (Emphasis added.)[2]

Art 1, § 20, in its earlier form, thus provided defendants an appeal of right from all criminal convictions. Accordingly, this Court held in *People v Smith*, 402 Mich 72; 259 NW2d 558 (1977), that defendants could appeal by right from plea-based convictions. Moreover, the Court of Appeals held that a defendant's right to appeal plea-based convictions included a corollary right to appointment of appellate counsel. *People v Gazaway*, 35 Mich App 39, 42; 192 NW2d 122 (1971).

Before the ratification of Proposal B in 1994, Michigan was one of only a handful of states that provided an unconditional right of appeal for those who

---

[2] The "as provided by law" language in this portion of Const 1963, art 1, § 20 was added by a constitutional amendment approved at a special election held on August 8, 1972.

pleaded guilty.[3] In 1994, the Legislature submitted Proposal B to the electorate to decide whether to make appeals from plea-based convictions discretionary. "Eliminating appeals as a matter of right from plea-based convictions was suggested as a way to help control the case load [sic] of the Michigan Court of Appeals." Note, *Limiting Michigan's guilty and nolo contendere plea appeals*, 73 U Det Mercy L R 431 (1996). By 1992, the Court of Appeals had a backlog of more than 4,000 cases awaiting decision, and "[p]lea-based appeals constitute[d] approximately thirty percent of all appeals facing the Michigan Court of Appeals." *Id.*, p 438. Eliminating appeals of right from plea-based convictions was one method proposed to reduce a crushing burden on our appellate courts.

The voters approved Proposal B by a margin of sixty-four percent to thirty-six percent. *Id.*, p 431. As amended, Const 1963, art 1, § 20 now states that an accused is entitled "to have an appeal as a matter of right, *except as provided by law an appeal by an accused who pleads guilty or nolo contendere shall be by leave of the court* . . . ." (Emphasis added.) Proposal B did not alter the provision of art 1, § 20 that grants defendants "as provided by law, when the trial

---

[3] See Krull, *Eliminating appeals from guilty pleas*, 29 Oct Ariz Atty 34, 35 (1992). Before a 1992 rule change in Arizona, that state

was but one of a small minority of states (seven in all) that allowed for the unrestricted appeal from judgments and sentences imposed pursuant to plea agreements. Of the remaining states, 21 do not allow for any appeals from plea agreements, six allow for appeals from plea agreements but restrict the issues that can be raised, and 16 allow for the express waiver of the right to appeal as a condition of a plea agreement. Arizona apparently has elected to become a member of this last group.

court so orders, . . . such reasonable assistance as may be necessary to perfect and prosecute an appeal." The Legislature subsequently enacted MCL 770.3(1)(e); MSA 28.1100(1)(e), providing for appeals from plea-based convictions by application for leave to appeal.

On December 30, 1994, this Court acted "to preserve the issue of appointment of counsel and payment therefor pending legislative clarification" because of "the absence of legislative action clarifying the Legislature's position regarding the right to appointment of counsel in guilty plea cases in light of the November 1994 amendment of Const 1963, art 1, § 20 . . . ." 447 Mich cl. We adopted, on an interim basis, MCR 6.425(F)(1)(c), which provides that "[i]n a case involving a conviction following a plea of guilty or nolo contendere the court should liberally grant the request [for appointed counsel] if it is filed within 42 days after sentencing." 447 Mich cliii.

This Court extended the expiration date of the amended court rule on several occasions "in anticipation of legislation regarding the appointment of appellate counsel in guilty plea cases." 455 Mich lxxx (1997). Concluding after several years of interim rules that the Legislature was not moving to address the problem, this Court extended the rule indefinitely. *Id.* In joining this Court's order, Justice BOYLE explained:

> Absent legislative implementation of the constitutional amendment and consistent with our reluctance to prejudge legal issues through exercise of the rule-making power, we have entered four interim orders authorizing appointment of counsel in order to protect an indigent defendant's ability to have the assistance of counsel in pursuing appellate remedies.

We have therefore repeatedly sought clarification of the Legislature's understanding of the amendment to avoid imposing costs on local funding units through court rules, expressing concern that the Legislature's failure to act reflects Headlee considerations.

Every indication is that we have reached stalemate. Rather than deprive defendants of the assistance of counsel that the voters might not intend, I agree that the Court should extend the rules indefinitely. [*Id.*, pp lxxx-lxxxi.]

While this case has been pending in this Court, statutory amendments were enacted requiring the appointment of appellate counsel in guilty plea cases in certain defined circumstances, permitting appointment in another, and otherwise providing that appellate counsel shall not be appointed. 1999 PA 200, MCL 770.3a; MSA 28.1100a. This act took effect on April 1, 2000. Because this new statute does not apply to defendant, the question of its constitutionality is not before us.[4]

III. RIGHT TO COUNSEL UNDER CONST 1963, ART 1, § 20

We first address defendant's contention that Const 1963, art 1, § 20 entitles him to appointed counsel. As amended, art 1, § 20 provides, in part:

In every criminal prosecution, the accused shall have the right . . . to have an appeal as a matter of right, except as provided by law an appeal by an accused who pleads guilty or nolo contendere shall be by leave of the court; and *as provided by law*, when the trial court so orders, to have

---

[4] Following the statute's enactment, we amended our court rules to eliminate the "liberally grant" standard of MCR 6.425(F)(1)(c) and to provide for the appointment of counsel in those circumstances directed by the statute.

such reasonable assistance as may be necessary to perfect
and prosecute an appeal. [Emphasis added.]

We emphasize that, after the ratification of Proposal B, indigent defendants who plead guilty or nolo contendere are no longer entitled to appeal their convictions as a matter of right. Rather, they must apply for leave to appeal. Defendant contends that, when applying for leave to appeal, he is entitled to the appointment of counsel as "reasonable assistance" that is "necessary to perfect and prosecute an appeal." A defendant, however, is entitled to "reasonable assistance" only when it is "provided by law" and "the trial court so orders." As discussed below, we conclude that defendant has no right to appointed counsel under our state constitution because the appointment of appellate counsel for an indigent defendant applying for leave to appeal from a plea-based conviction was not provided by law at any relevant time in this case.

In construing our constitution, this Court's object is to give effect to the intent of the people adopting it. *Charles Reinhart Co v Winiemko*, 444 Mich 579, 606; 513 NW2d 773 (1994). "Hence, the primary source for ascertaining its meaning is to examine its plain meaning as understood by its ratifiers at the time of its adoption." *Id.* Since the 1972 amendment, art 1, § 20 has provided that a defendant is only entitled, *as provided by law*, and when the trial court so orders, to such reasonable assistance as is necessary to perfect and prosecute an appeal. Before the passage of Proposal B, however, no reason existed for this Court to construe the "as provided by law" language. Since guilty plea appeals were as of right, and the United States Constitution requires that the state provide

counsel in a first appeal of right, *Douglas v California*, 372 US 353; 83 S Ct 814; 9 L Ed 2d 811 (1963), this Court was never called upon to decide whether the appointment of appellate counsel in guilty plea appeals was "provided by law." Because the ratification of Proposal B made guilty plea appeals discretionary, we must now consider that question.

The drafters of the 1963 Constitution used the phrase "provided by law" in several provisions. See, e.g., Const 1963, art 6, §§ 10, 15, 28. This Court has consistently construed the "provided by law" language as vesting authority to act in the Legislature. For example, Const 1963, art 6, § 15 provides that the jurisdiction, powers, and duties of the probate courts "shall be provided by law." In *Buback v Governor*, 380 Mich 209, 226; 156 NW2d 549 (1968), this Court held that art 6, § 15 grants *the Legislature* the power to define the probate courts' jurisdiction and noted as follows regarding the meaning of the phrase "provided by law" in our constitution:

> The committee on style and drafting of the constitutional convention of 1961 made a distinction in the use of the words "prescribed by law" and the words "provided by law." Where "provided by law" is used, it is intended that the legislature shall do the entire job of implementation. Where only the details were left to the legislature and not the overall planning, the committee used the words "prescribed by law." See 2 Official Record, Constitutional Convention of 1961, pp 2673, 2674. [380 Mich 226.]

See also *In re Kasuba Estate*, 401 Mich 560, 566; 258 NW2d 731 (1977) ("[t]he Constitution provides for statutory definition of the jurisdiction of probate courts and our power to make rules of practice and

procedure cannot be used to expand that jurisdiction without legislative consent").

The drafters also used the phrase "provided by law" in art 6, § 10: "The jurisdiction of the court of appeals shall be provided by law and the practice and procedure therein shall be prescribed by rules of the supreme court." The plain language of this section clearly reveals that the phrase "provided by law" does not include this Court's rulemaking powers. Accordingly, this Court stated in *People v Cooke*, 419 Mich 420, 430; 355 NW2d 88 (1984), that "[t]he Legislature, not this Court, has the power under the constitution to prescribe the jurisdiction of the Court of Appeals."

Further, Const 1963, art 5, § 29, provides, in part, that the Civil Rights Commission "shall have other powers provided by law to carry out its purposes." In *Beech Grove Investment Co v Civil Rights Comm*, 380 Mich 405, 419; 157 NW2d 213 (1968), Justice ADAMS, writing for a plurality of the Court, construed art 5, § 29 to afford the Legislature the task of granting such "other powers" to the Civil Rights Commission. Thus, this Court has consistently held that use of the phrase "provided by law" in our constitution contemplates *legislative* action. Where action by this Court pursuant to its rulemaking powers is contemplated, the constitution explicitly says so. See, e.g., Const 1963, art 6, §§ 10, 30.

The constitutional provision presently under consideration, art 1, § 20, provides that an accused has the right "*as provided by law*, when the trial court so orders, to have such reasonable assistance as may be necessary to perfect and prosecute an appeal." (Emphasis added.) Given the use of the phrase "as provided by law" in this section, our state constitu-

tion entitles defendant to the appointment of counsel only to the extent that such assistance is *legislatively* required. When defendant requested appointment of appellate counsel at state expense, the Legislature had not acted to provide appointed counsel for indigent defendants seeking leave to appeal from plea-based convictions. Since the Legislature had not acted, the appointment of counsel for defendant was not "provided by law." Accordingly, Const 1963, art 1, § 20, does not afford defendant the right to appointed counsel.

Defendant does not contend in this Court that 1999 PA 200 governs his case as his request for counsel occurred before the effective date of the act. Nor does defendant argue that, if the statute applied, he would satisfy any of the conditions for appointing counsel to pursue the application.

Defendant's reliance on MCR 6.425(F)(1)(c) is likewise misplaced. When defendant requested counsel, the court rule provided:

> In a case involving a conviction following a plea of guilty or nolo contendere the court should liberally grant the request [for appointed counsel] if it is filed within 42 days after sentencing.

Under Const 1963, art 1, § 20, however, this Court lacked the authority to adopt MCR 6.425(F)(1)(c). The phrase "provided by law" permits action by the Legislature only. Accordingly, this Court could not use its rulemaking powers to provide for appointed appellate counsel in the absence of legislative action.[5]

---

[5] To the extent that the Court of Appeals relied on and construed MCR 6.425(F)(1)(c) in *Najar, supra,* that decision is overruled.

The Michigan Constitution does not afford indigent defendants seeking leave to appeal from plea-based convictions the right to appointed counsel absent legislative action.

### IV. RIGHT TO COUNSEL UNDER THE FEDERAL CONSTITUTION

We next address defendant's argument that the federal constitution guarantees him the right to appointed appellate counsel when seeking leave to appeal his guilty plea conviction. Of course, the federal constitution does not require the fifty states to provide any appeal whatsoever to criminal defendants. *Ross v Moffitt*, 417 US 600, 606; 94 S Ct 2437; 41 L Ed 2d 341 (1974); *McKane v Durston*, 153 US 684; 14 S Ct 913; 38 L Ed 867 (1894). As discussed, after the enactment of Proposal B, Michigan no longer affords an appeal of right to defendants who plead guilty or nolo contendere. Art 1, § 20. A defendant who pleads guilty or nolo contendere may only appeal his conviction by seeking and obtaining leave from the Court of Appeals.

Our research discloses no authority that recognizes the right to appeal a plea of guilty as a fundamental right. Under the due process-equal protection test of *Ross v Moffitt*, *supra*, Michigan's scheme gives guilty-pleading defendants a fair opportunity to have their claims heard in our appellate courts. Further, Michigan's current arrangements for inmate access to the courts, including law libraries, paralegal assistance, and staff attorney programs, satisfy the so-called right to meaningful access. Accordingly, we conclude that Michigan's scheme does not offend the Fourteenth Amendment.

The United States Supreme Court has never specifi-
cally held that the federal constitution commands that
an indigent defendant who pleads guilty or nolo con-
tendere, and whose appeal therefrom is purely discre-
tionary, is entitled to the appointment of appellate
counsel. In *Douglas*, the California District Court of
Appeals denied the defendants' request for appointed
appellate counsel in their appeal of right following
their convictions at trial. *Douglas, supra*, pp 353-355.
The Court required the states to furnish appellate
counsel for indigent defendants in their first appeal
*as of right. Id.*, pp 356-357. The *Douglas* Court relied
on *Griffin v Illinois*, 351 US 12; 76 S Ct 585; 100 L Ed
891 (1956), in which the Court, in a plurality opinion,
held that a state cannot deny a defendant an appeal
because he lacks the financial resources to purchase
a trial transcript. In *Douglas*, the Court reasoned, in
part, as follows:

> There is lacking that equality demanded by the Four-
> teenth Amendment where the rich man, who appeals as of
> right, enjoys the benefit of counsel's examination into the
> record, research of the law, and marshalling of arguments
> on his behalf, while the indigent, already burdened by a pre-
> liminary determination that his case is without merit [under
> California's then-existing system for deciding whether to
> appoint counsel], is forced to shift for himself. The indigent,
> where the record is unclear or the errors are hidden, has
> only the right to a meaningless ritual, while the rich man
> has a meaningful appeal. [*Id.*, pp 357-358.]

The Court also noted, however, "that a State can, con-
sistently with the Fourteenth Amendment, provide for
differences so long as the result does not amount to a

denial of due process or an 'invidious discrimination.' " *Id.*, p 356.[6]

In *Ross*, North Carolina provided the defendant appointed counsel in his appeal of right to their intermediate appellate court following a conviction at trial. *Id.*, pp 603-604. That court affirmed the convictions, and the defendant then sought to invoke the discretionary review procedure of the North Carolina Supreme Court. *Id.* The North Carolina Supreme Court refused to appoint counsel for review in that court. *Id.*

The Supreme Court affirmed the North Carolina Supreme Court. It held that the federal constitution does not require the appointment of appellate counsel on discretionary review to the North Carolina Supreme Court. *Id.*, pp 610-612. Unlike *Douglas*, *Ross* separately analyzed the issue under both the Due Process and Equal Protection Clauses. In its due process analysis, the Court noted a fundamental difference between the trial and appellate stages of criminal proceedings. *Id.*, pp 610-611. At trial, due process requires that the state provide the accused counsel as a shield to fend off the state's efforts to convict him. *Id.* "By contrast, it is ordinarily the defendant, rather than the State, who initiates the appellate process, seeking not to fend off the efforts of the State's prosecutor but rather to overturn a finding of guilt made by a judge or jury below." *Id.*, p 610. Appellate counsel serves as a sword rather than a shield. *Id.*, pp 610-

---

[6] As the Court later noted in *Ross*, the *Douglas* Court did not explicitly indicate whether its holding was based on the Due Process Clause or the Equal Protection Clause. "Neither Clause by itself provides an entirely satisfactory basis for the result reached, each depending on a different inquiry which emphasizes different factors." *Id.*, 417 US 609.

611. The Court thus concluded that "[u]nfairness results only if indigents are singled out by the State and denied meaningful access to the appellate system because of their poverty. That question is more profitably considered under an equal protection analysis." *Id.*, p 611.

In its equal protection analysis, the *Ross* Court explained that the Fourteenth Amendment does not require absolute equality, but does require an appellate system that is free of unreasoned distinctions. *Id.*, p 612.

> The duty of the State under our cases is not to duplicate the legal arsenal that may be privately retained by a criminal defendant in a continuing effort to reverse his conviction, but only to assure the indigent defendant an adequate opportunity to present his claims fairly in the context of the State's appellate process. [*Id.*, p 616.]

In concluding that appointed counsel is not required for a discretionary appeal to a state Supreme Court, the United States Supreme Court noted that the defendant had "received the benefit of counsel in examining the record of his trial and in preparing an appellate brief on his behalf for the state Court of Appeals" in his first appeal of right. *Id.*, p 614. The United States Supreme Court thus reasoned:

> We do not believe that it can be said, therefore, that a defendant in respondent's circumstances is denied meaningful access to the North Carolina Supreme Court simply because the State does not appoint counsel to aid him in seeking review in that court. At that stage he will have, at the very least, a transcript or other record of trial proceedings, a brief on his behalf in the Court of Appeals setting forth his claims of error, and in many cases an opinion of the Court of Appeals disposing of his case. These materials,

supplemented by whatever submission respondent may make pro se, would appear to provide the Supreme Court of North Carolina with an adequate basis for its decision to grant or deny review. [*Id.*, p 615.]

The doctrinal basis of the *Griffin/Douglas* line is difficult to ascertain. To the extent that *Griffin* and *Douglas* rely on equal protection principles, *Washington v Davis*, 426 US 229; 96 S Ct 2040; 48 L Ed 2d 597 (1976), undermined their validity by making proof of discriminatory purpose an essential element of an equal protection claim. Const 1963, art 1, § 20 is unquestionably facially neutral. Defendant in this case has not shown that the state intended to discriminate against criminal defendants on the basis of indigency. Recently, however, the Supreme Court in *MLB v SLJ*, 519 US 102; 117 S Ct 555; 136 L Ed 2d 473 (1996), rejected the notion that *Davis* had implicitly overruled the *Griffin/Douglas* line. In *MLB*, the Court extended the *Griffin* rationale to require Mississippi to supply a record to an indigent parent whose parental rights had been terminated to permit proper appellate consideration of her claims. While noting that the *Griffin* line of cases have reflected both equal protection and due process concerns, the *MLB* Court reasoned that most decisions in this area rest on an equal protection framework since "due process does not independently require that the State provide a right to appeal." *Id.*, p 120. The Court distinguished termination of parental rights cases from the "mine run," *id.*, p 116, of civil cases on the ground that they involve the permanent destruction of "the most fundamental family relationship." *Id.*, p 121. The Court did not explain, however, why the *Davis* purposeful discrimination requirement is inapposite. Indeed, the

Supreme Court has yet to articulate any constitutional underpinnings for its "access to appeal" decisions in light of its own modern equal protection jurisprudence.

Despite the muddled state of its jurisprudence, we adhere to our duty to attempt to understand and apply what the Supreme Court has opined regarding the right of meaningful access. As explained below, we conclude that meaningful access does not require the appointment of counsel for defendants who seek discretionary leave to appeal from their guilty pleas. Our current system already provides those defendants with an adequate opportunity to present their claims fairly.

A. DISTINCT NATURE OF PLEA PROCEEDINGS

Appeals from plea-based convictions and appeals from convictions obtained following trials, like those appeals at issue in *Douglas* and *Ross*, are fundamentally different. Foremost, a defendant who tenders a plea has admitted guilt of the offense in open court. "[A] guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." *Tollett v Henderson*, 411 US 258, 267; 93 S Ct 1602; 36 L Ed 2d 235 (1973).

Further, the state has a "fundamental interest in the finality of guilty pleas . . . ." *Hill v Lockhart*, 474 US 52, 58; 106 S Ct 366; 88 L Ed 2d 203 (1985). A guilty

plea evidences a defendant's desire to terminate the prosecution. Thus, a defendant who concedes his guilt has acceded to the state's fundamental interest in finality.

Plea proceedings are also shorter, simpler, and more routine than trials; the record most often consists of the "factual basis" for the plea that is provided to the trial court. In contrast with trials, less danger exists in plea cases that the record will be so unclear, or the errors so hidden, that the defendant's appeal will be reduced to a meaningless ritual. Also, a concession of guilt limits considerably the potential issues that can be raised on appeal. See 1A Gillespie, Michigan Criminal Law & Procedure (2d ed), § 16:30, pp 94-104 (discussing the effect of a plea on the availability of various appellate claims).[7] These are all reasoned distinctions that are relevant to determining whether Michigan provides "meaningful access" to the appellate courts.

---

[7] By pleading guilty or nolo contendere, a defendant waives the following issues: search and seizure claims, defective complaint and warrant claims, claims of error as to the preliminary examination (including sufficiency of the proofs to bind over), Fifth Amendment claims, nonjurisdictional evidentiary issues, challenges to operating a vehicle while under influence of alcohol predicate offenses, claims (including constitutional claims) relating to the defendant's factual guilt and the prosecution's ability to prove the case, claims of error in juvenile waiver proceedings, speedy trial claims (if the plea is unconditional), claims of violation of the statutory 180-day rule, claims of speedy trial under MCL 768.1; MSA 28.1024, claims of failure to timely file the habitual information, statute of limitations claims, unpreserved entrapment claims, double jeopardy claims that are unpreserved so that the necessary facts to support the claim are missing, and ineffective assistance of counsel claims in which the underlying issues are waived by a guilty plea. Gillespie, Michigan Criminal Law & Procedure, Practice Deskbook (2d ed), § 10:50, pp 10-15 to 10-17.

B. INDIGENT GUILTY PLEA DEFENDANTS IN MICHIGAN HAVE
MEANINGFUL ACCESS TO THE APPELLATE SYSTEM

Given the obvious differences between trial-based and guilty plea convictions, it is clear that our current guilty plea procedures provide sufficient methods of assistance to meet the *Ross* meaningful access requirement. To preserve an issue for appeal, a defendant must move to withdraw his plea before the trial court. MCR 6.311(C). MCR 6.005(H)(4) states that "unless an appellate lawyer has been appointed, [appointed trial counsel is responsible for the] filing of postconviction motions the lawyer deems appropriate, including motions . . . *to withdraw plea, or for resentencing.*" (Emphasis added.) Thus, our court rules require trial counsel to assist the defendant in organizing and presenting to the trial court any potential appellate issues that warrant preservation. Accordingly, a pro se defendant seeking discretionary review will have the benefit of a transcript, trial counsel's framing of the issues in the motion to withdraw, and the trial court's ruling on the motion. As in *Ross*, these factors will aid the defendant in identifying and asserting claims. Further, prison inmates filing discretionary applications will have the same access to law libraries, paralegal assistance, and staff attorneys that Michigan provides to them in other postconviction proceedings. While trial counsel cannot be relied on to advise the defendant of ineffective assistance of counsel claims, those claims that have merit likely will be apparent on the record.[8]

---

[8] The dissent asserts that "a 'correct adjudication of guilt' involves more than just an admission of guilt. Claims of failures to honor plea bargains, coercion or involuntariness of a plea, or lack of mental capacity to

We acknowledge that the tools available to indigent defendants seeking leave to appeal from their guilty pleas are not equivalent to those present in *Douglas* and *Ross*. However, *Douglas* and *Ross* both involved appeals from convictions following trial. Neither *Douglas* nor *Ross* addressed the issue before us, namely, whether a defendant is entitled under the federal constitution to appointed counsel in a first *discretionary* appeal from a plea-based conviction. As stated, the differences between trial- and plea-based convictions are undeniable. Thus, any statements in *Douglas* and *Ross* suggesting the necessity of a reasoned lower court decision and a brief prepared by an attorney in the lower court must be considered in the context in which those cases were decided.

Finally, we acknowledge that the Court has, since *Ross*, continued to expand its "meaningful access" line of cases in the context of filing fees and transcripts. See, e.g., *MLB, supra*. However, we note that none of those decisions have expanded on the right to *counsel* recognized in *Douglas*. Thus, we conclude

---

knowingly enter a plea, for example, all address the correctness of the 'adjudication of guilt.' " *Post*, p 560.

The dissent utterly fails to explain why the constitution compels appointment of counsel to identify and assert those guilty plea issues that the dissent labels as involving a " 'correct adjudication of guilt.' " *Id.* Claims of failures to honor plea bargains, coercion or involuntariness of a plea, and lack of mental capacity to enter a plea are all examples of issues that require preservation by a motion to withdraw under MCR 6.311(C). A defendant will accordingly have assistance of appointed trial counsel in identifying and raising those issues worth preserving. MCR 6.005(H)(4).

Moreover, most of these claims would likely be apparent to the defendant either from the record or through his own knowledge; a defendant normally would not require the assistance of an appellate attorney to know, for example, that he was coerced into pleading guilty or that the prosecutor made a promise that has not been honored. The possibility that an attorney might prove helpful in some cases does not mean that the constitution *requires* the appointment of appellate counsel.

that the free transcript and counsel cases are really on separate trajectories. Indeed, compare the Court's expansive jurisprudence in the free transcript/filing fees cases against its contracting jurisprudence regarding the right to counsel in identical settings. See, e.g., 3 LaFave, Israel & King, Criminal Procedure (2d ed), §§ 11.2(c) and (d). The Court has extended the right to transcripts at state expense in collateral attack cases and habeas corpus proceedings. In the analogous postconviction setting, the Court has never voted to expand the *Douglas* right to counsel. Since *Douglas* itself, the Supreme Court has never, not once, even in the case of inmates on death row, ordered counsel appointed for individual petitioners as a component of the right of meaningful access.[9]

### V. CONCLUSION

No one questions that the appointment of appellate counsel at state expense would be more efficient and helpful not only to defendants, but also to the appellate courts. The distinct character of plea proceedings, however, will "make this relative handicap far

---

[9] The dissent continually asserts that our decision in this case creates a new scheme. In truth, the people of Michigan created a new scheme. Their approval of Proposal B made guilty plea appeals discretionary. Also, the people's representatives in the Legislature had not acted to provide appellate counsel at taxpayer expense to upset guilty pleas during the relevant period in this case. Rather than *creating* a new scheme, our decision upholds the system created by the people directly and through their elected representatives.

Similarly, the dissent suggests that our holding creates the "system we will come to know in Michigan." *Post*, p 553. The dissent overlooks the fact that our decision concerns only those guilty pleas appeals after the passage of Proposal B but before the enactment of 1999 PA 200. Thus, the "system we will come to know in Michigan" is the one recently chosen by the Legislature, barring a successful challenge on constitutional grounds.

less than the handicap borne by the indigent defendant denied counsel on his initial appeal as of right," *Ross, supra,* p 616, from a trial conviction.[10] Even more important, "the fact that a particular service might be of benefit to an indigent defendant does not mean that the service is constitutionally required." *Id.* "The Fourteenth Amendment 'does not require absolute equality or precisely equal advantages,' . . . nor does it require the State to 'equalize economic conditions.' " *Id.,* p 612. "We address not what is prudent or appropriate, but only what is constitutionally compelled." *Smith v Robbins,* 528 US 259, ___; 120 S Ct 746, 763; 145 L Ed 2d 756 (2000) (internal quotation omitted).[11]

In summary, defendant is not entitled to appointed appellate counsel under either the state or federal constitution. Defendant is not entitled to the appointment of appellate counsel under art 1, § 20 because such assistance was not "provided by law" when defendant requested counsel. Moreover, the federal constitution does not mandate appointment of counsel under the present circumstances because defend-

---

[10] The dissent accuses us of "sandwiching this quotation from *Ross* between [our] own modifiers" and of "relying on snippets from *Ross* without accounting for its reasoning that counsel could be denied on a discretionary appeal following an appeal where counsel was provided." *Post,* p 560. This accusation is baseless. We have fully and fairly discussed *Ross'* reasoning and holding. We obviously do not suggest through the above quotation that *Ross* decided the precise issue in this case.

[11] The dissent devotes much of its analysis to showing that appointment of counsel would aid a defendant in identifying potential errors and asserting claims. This line of reasoning is based on a faulty premise, i.e., that the constitution *requires* states to do everything that would make appellate practice easier and more efficient. *Ross, supra,* p 616. By arguing, in effect, that appointment of counsel would be "prudent or appropriate," the dissent fails to explain why it is "constitutionally compelled." *Smith, supra,* 120 S Ct 763.

ant has not been denied meaningful access to Michigan's appellate courts. Accordingly, we vacate the Court of Appeals order, reinstate the trial court's order denying appointment of counsel, and remand the case to the trial court so that defendant may pursue his application for leave to appeal his convictions.[12]

WEAVER, C.J., and TAYLOR and YOUNG, JJ., concurred with CORRIGAN, J.

CAVANAGH, J. I dissent from the majority opinion. That opinion swerves and dodges the decisions of the United States Supreme Court to generate a rationale for denying counsel in this case, and in doing so sets up a system that requires payment at the door for access to justice. Those who cannot pay that fee are offered only a meaningless ritual, although those who can afford it will have a meaningful appeal. By denying counsel to indigent defendants and setting up this system, the majority commits structural error, which presumptively results in prejudice. See *Penson v Ohio*, 488 US 75, 88; 109 S Ct 346; 102 L Ed 2d 300 (1988). I profoundly hope that this matter will make its way to the United States Supreme Court, so that Court can correct the constitutional miscarriage committed by the majority, and so that it can issue the

---

[12] We observe that the United States District Court for the Eastern District of Michigan recently enjoined the enforcement of 1999 PA 200 and the provisions of MCR 6.425 designed to implement it following that court's earlier declaration that the statute is unconstitutional. *Tesmer v Kowalski*, unpublished opinion of the United States District Court for the Eastern District of Michigan, issued June 30, 2000 (Docket No. 00-CV-10082). However, the district court expressly limited the scope of its injunctive order to the enforcement of 1999 PA 200. Accordingly, as the federal district court itself acknowledged, the decision in *Tesmer* does not affect the proceedings in this case.

decision that is uniformly directed by its past opinions.

## I

After announcing that the United States Supreme Court has never addressed the precise question before this Court, the majority pursues a path that would allow it a free hand to take this case to the desired destination. That path begins with the statement that the "doctrinal basis" of *Douglas v California*, 372 US 353; 83 S Ct 814; 9 L Ed 2d 811 (1963), and *Ross v Moffitt*, 417 US 600; 94 S Ct 2437; 41 L Ed 2d 341 (1974), is "difficult to ascertain." *Ante* at 515. Having left the designated path by searching for doctrinal clarity, which the Supreme Court itself has disclaimed by admitting that the precise rationale for these cases has never been articulated, see *Smith v Robbins*, 528 US 259, __; 120 S Ct 746, 759; 145 L Ed 2d 756 (2000), the majority proceeds down a road it calls "meaningful access." *Ante* at 522.

The Court's decisions in *Douglas* and *Ross*, and what those constitutional decisions require in the instant case, are not so difficult to understand, though, by considering the understanding the Supreme Court itself has had of those cases. Throughout the cases following *Douglas* and *Ross*, the Court has stated that it has "held again and again, an indigent defendant is entitled to the appointment of counsel to assist him on his first appeal . . . ." *Entsminger v Iowa*, 386 US 748, 751; 87 S Ct 1402; 18 L Ed 2d 501 (1967). By closely examining *Douglas*, *Ross*, and their progeny, why counsel was required in *Douglas*, and why the Court concluded that counsel

was not constitutionally required in *Ross*, become clear.

Indeed, those decisions of our nation's highest Court poignantly outline the route laid out by the constitution. Though the majority views these decisions as land mines, and weaves to and fro to avoid them, I find them to construct a path. By following that constitutional path, I conclude that, as a matter of federal constitutional law, indigent defendants must have appointed counsel to assist them in pursuing their appeals by leave, their first and only appeal on the merits.

### A. OUR JOURNEY BEGINS: *GRIFFIN v ILLINOIS* [1]

In our society, sometimes a sense prevails that if some of its members have not provided for themselves all that they need, they have only themselves to blame. Despite this social sense, in the context of a criminal prosecution, it clearly runs headlong into the view, embodied in our constitution, that all people are equal before the law and are entitled to basic protections in its face. The United States Supreme Court first recognized the supremacy of this latter view, as it relates to the availability of avenues of appeal from

---

[1] We could as profitably begin our journey at many other points, one being *Gideon v Wainwright*, 372 US 335; 83 S Ct 792; 9 L Ed 2d 799 (1963). In that case, the Court held that the right of an indigent defendant to appointed counsel at the trial stage of a criminal proceeding was fundamental and binding upon the states by application of the Sixth and Fourteenth Amendments. Likely indeed, the right to counsel may be traced further into our history than that. See Cooley, Constitutional Limitations, p 334 ("The humanity of the law has generally provided that, when the prisoner is unable to employ counsel, the court may designate some one to defend [a person] . . . who has the double misfortune to be stricken by poverty and accused of crime"). Nonetheless, for the sake of relative brevity, we will begin with *Griffin*.

criminal convictions, in *Griffin v Illinois*, 351 US 12; 76 S Ct 585; 100 L Ed 891 (1956). In that case, the Court held that a state may not grant appellate review in a way that discriminates because of poverty or financial status. Although on its face this rule appears clear enough, it has proven difficult in practice. From this simple beginning, the federal courts have been called on repeatedly to define the lines of constitutional protection, first as various states continued to operate systems that failed to grasp the rule's essence, and then as states created systems that attempted to skirt the lines of past decisions to yield savings in financial or judicial resources.[2]

### B. *DOUGLAS v CALIFORNIA*: AN END TO MEANINGLESS RITUAL IN THE FIRST APPEAL

Our nation's Supreme Court first passed directly on the right to appointed counsel on appeal in *Douglas v California*, *supra*. There, the defendants, following conviction on a variety of felonies, sought review in the California District Court of Appeal. In the course of seeking review, the defendants sought, and were denied, appointed counsel. The district court reasoned that it had "gone through" the record and concluded that "no good whatever could be served by appointment of counsel." *Id.* at 354-355.

---

[2] See, e.g., *Bundy v Wilson*, 815 F2d 125 (CA 1, 1987). In that case, the New Hampshire Supreme Court, likely motivated by concerns similar to those underlying Proposal B, sought to conserve judicial resources by enacting a system that provided for the court to review a notice of appeal and, on that basis alone, determine whether to grant leave to appeal. The opportunity for argument was not available, and transcripts were not provided to aid indigent defendants in preparing such notices. Deciding the case on due process grounds, the United States Court of Appeals for the First Circuit held the system constitutionally invalid. *Id.* at 135.

The Supreme Court believed this entire concept most troubling:

> In spite of California's forward treatment of indigents, under its present practice the type of an appeal a person is afforded in the District Court of Appeal hinges upon whether or not he can pay for the assistance of counsel. If he can the appellate court passes on the merits of his case only after having the full benefit of written briefs and oral argument by counsel. If he cannot the appellate court is forced to prejudge the merits before it can even determine whether counsel should be provided. At this stage in the proceedings only the barren record speaks for the indigent, and, unless the printed pages show that an injustice has been committed, he is forced to go without a champion on appeal. Any real chance he may have had of showing that his appeal has hidden merit is deprived him when the court decides on an ex parte examination of the record that the assistance of counsel is not required. [*Id.* at 355-356.]

Save the gracious comments regarding California's treatment of indigency in other circumstances, this statement applies with equal force, and in fact describes, the system approved by the majority today. The only difference is that when the indigent is "deprived of a champion," the prosecutor faces no such burden, and can command all his knowledge, experience, and resources to rebut any arguments the unskilled indigent could offer on his own.

Nonetheless, the *Douglas* Court, showing admirable restraint, limited itself to the facts before it. The Court cautioned:

> We are not here concerned with problems that might arise from the denial of counsel for the preparation of a petition for discretionary or mandatory review beyond the stage in the appellate process at which the claims have once been presented by a lawyer and passed upon by an

appellate court. We are dealing only with the first appeal, granted as a matter of right to rich and poor alike . . . . [*Id.* at 356.][3]

The Court concluded this portion of the discussion by noting that "where the merits of the one and only appeal an indigent has as of right are decided without benefit of counsel, we think an unconstitutional line has been drawn between rich and poor." *Id.* at 357.[4]

Thus, from *Douglas*, several lessons are apparent. First, the type of appeal a person is afforded may not "hinge[] upon whether or not he can pay for the assistance of counsel." *Id.* at 355-356. Second, the Court appears to link in large measure counsel's availability to an indigent defendant on his first appeal with "[a]ny real chance he may have had of showing that his appeal has hidden merit . . . ." *Id.* at 356. The deprivation of one equals the deprivation of the other. *Id.*

---

[3] The majority has focused solely on the words "granted as a matter of right" to argue that the Court in *Douglas* limited its holding so that it is wholly inapplicable to our post-Proposal B appeal by leave appellate scheme. As further discussed below, however, when mentioning limits, the Court clearly spoke in terms of discretionary review beyond the first level of the appellate process. In doing so, the Court foreshadowed not only its subsequent decision in *Ross*, but also the way it would view *Douglas* in subsequent decisions.

[4] Worth noting is that the procedure approved in *People v Najar*, 229 Mich App 393; 581 NW2d 302 (1998), is quite similar to the procedure apparently used by the California court in *Douglas*. Indeed, the California procedure compares favorably to the *Najar* procedure, given that under the California procedure, it was the appellate court that did the "going through" of the record in search of errors, although the *Najar* Court suggested that the trial court would survey the record in search of its own errors that might appear reversible. Under the system envisioned by the *Najar* panel, the California court's finding that "no good whatever" could come from the appointment of counsel would likely be repeated with even greater frequency.

Not precisely clear from the face of *Douglas* is the scope of the opinion as it applies to first appeals not of right. The language of the case addresses first appeals as of right, and thus could be read, as the majority demonstrates, to preclude applicability regarding first appeals not of right. However, other portions of the opinion's language, and certainly its logic, dictate that the limitation precludes the opinion's application only to discretionary appeals following first appeals.[5]

Fortunately, the Supreme Court has not left us without guidance on this matter, but has discussed its view of the holding in *Douglas* on many occasions. The first of these, and thus the next stop on our journey, is *Ross v Moffitt, supra.*

Before proceeding onward, though, we must pause at the point that has come to define the evil that *Douglas* sought to eradicate:

> The present case, where counsel was denied petitioners on appeal, shows that the discrimination is not between "possibly good and obviously bad cases," but between cases where the rich man can require the court to listen to argument of counsel before deciding on the merits, but a poor man cannot. There is lacking that equality demanded by the Fourteenth Amendment where the rich man, who appeals as of right, enjoys the benefit of counsel's examination into the record, research of the law, and marshalling of arguments on his behalf, while the indigent, already burdened by a preliminary determination that his case is without merit, is forced to shift for himself. The indigent, where the record is unclear or the errors are hidden, has only the right

---

[5] "We need not now decide whether California would have to provide counsel for an indigent seeking a discretionary hearing from the California Supreme Court after the District Court of Appeal had sustained his conviction . . . ." *Douglas, supra* at 356.

to a meaningless ritual, while the rich man has a meaningful appeal. [*Id.* at 357-358.]

Mindful of this, we proceed on to *Ross*.

### C. *ROSS v MOFFITT*: THE OUTER BOUNDARY DEFINED

In *Ross*, the Court was presented with the opportunity to decide the essential question left open in *Douglas*, whether the right to appointed counsel would extend to discretionary appeals following an appeal of right. The Court was actually presented with two distinct discretionary appellate routes for which counsel was sought, one for assistance in seeking to appeal to the North Carolina Supreme Court, and the other for assistance in seeking certiorari before the United States Supreme Court.

Following two separate forgery convictions, the respondent, while represented by appointed counsel, appealed to the North Carolina Court of Appeals. That court affirmed his convictions. Afterward, the defendant was denied counsel in his quest to seek review before both the North Carolina and the United States Supreme Courts. Appeal to the latter Court, of course, is available in this context only by way of an entirely discretionary grant of certiorari. Likewise, appeal to the North Carolina Supreme Court was also discretionary and available only by leave of court. In determining which cases to grant leave, the North Carolina Supreme Court, much as our Court does, followed particular rules that embodied concepts beyond the mere correctness of the result in a particular case.

In North Carolina, the court had the discretion to grant leave if it found that the application satisfied

the applicable statute. To grant, the court had to find "(1) The subject matter of the appeal has significant public interest, or (2) The cause involves legal principles of major significance to the jurisprudence of the State, or (3) The decision of the Court of Appeals appears likely to be in conflict with a decision of the Supreme Court." *Ross, supra* at 613-614, quoting NC Gen Stat 7A-31(c). These rules bear a close resemblance to our own rules for granting leave, in our case delineated by MCR 7.302(B).[6]

Writing for the Court, Justice Rehnquist began with a review of the Court's past cases addressing indigent appeals. Referencing *Griffin, Draper v Washington,* 372 US 487; 83 S Ct 774; 9 L Ed 2d 899 (1963), *Smith v Bennett,* 365 US 708; 81 S Ct 895; 6 L Ed 2d 39 (1961), and *Burns v Ohio,* 360 US 252; 79 S Ct 1164; 3 L Ed 2d 1209 (1959), Justice Rehnquist noted that the "decisions discussed above stand for the proposition that a State cannot arbitrarily cut off appeal

---

[6] Compare the North Carolina statute with our court rule:

(B) Grounds. The application must show that

(1) the issue involves a substantial question as to the validity of a legislative act;

(2) the issue has significant public interest and the case is one by or against the state or one of its agencies or subdivisions or by or against an officer of the state or one of its agencies or subdivisions in the officer's official capacity;

(3) the issue involves legal principles of major significance to the state's jurisprudence;

(4) in an appeal before decision by the Court of Appeals, delay in final adjudication is likely to cause substantial harm;

(5) in an appeal from a decision of the Court of Appeals, the decision is clearly erroneous and will cause material injustice or the decision conflicts with a Supreme Court decision or another decision of the Court of Appeals; or

(6) in an appeal from the Attorney Discipline Board, the decision is erroneous and will cause material injustice. [MCR 7.302.]

rights for indigents while leaving open avenues of appeal for more affluent persons." *Ross, supra* at 607. From this rule, he then noted that *Douglas* "departed somewhat from the limited doctrine of the transcript and fee cases and undertook an examination of whether an indigent's access to the appellate system was adequate." *Id.* He reasoned further:

> The Court in *Douglas* concluded that a State does not ful-fill its responsibility toward indigent defendants merely by waiving its own requirements that a convicted defendant procure a transcript or pay a fee in order to appeal, and held that the State must go further and provide counsel for the indigent on his first appeal as of right. [*Id.*]

Discussing *Douglas*, Justice Rehnquist also noted the key distinction discussed above:

> that under this system an indigent's case was initially reviewed on the merits without the benefit of any organiza-tion or argument by counsel. By contrast, persons of greater means were not faced with the preliminary "ex parte examination of the record," but had their arguments presented to the court in fully briefed form. [*Id.* at 608 (internal citations omitted).]

As the Court stated, "[t]he precise rationale for the *Griffin* and *Douglas* lines of cases has never been explicitly stated, some support being derived from the Equal Protection Clause of the Fourteenth Amend-ment, and some from the Due Process Clause of that Amendment." *Id.* at 608-609.

Justice Rehnquist, though first recognizing the via-bility of a Due Process Clause analysis, nonetheless found that such a path would not lead to appointing counsel in the case before the Court, focusing on the differences between trial and appellate situations.

"The fact that an appeal has been provided does not automatically mean that a State then acts unfairly by refusing to provide counsel to indigent defendants at every stage of the way." *Id.* at 611.

Justice Rehnquist then noted that "[l]anguage involving equal protection notions is prominent in both *Douglas* and in other cases treating the rights of indigents on appeal."[7] Although the states cannot "adopt procedures which leave an indigent defendant 'entirely cut off from any appeal at all,' by virtue of his indigency," *id.* at 612, quoting *Lane v Brown,* 372 US 477, 481; 83 S Ct 768; 9 L Ed 2d 892 (1963), or "extend to such indigent defendants merely a 'meaningless ritual' while others in better economic circumstances have a 'meaningful appeal,'" *id.,* quoting *Douglas, supra* at 358, "[t]he question is not one of absolutes, but one of degrees." *Id.* Thus, it appears that, although *Douglas* clearly represented a level of disparate treatment that could not be tolerated by the Court, other situations, in some way degrees apart, but less invidious than the procedure in *Douglas,* might be acceptable. Rather than an absolute rule, *Douglas* instead offers a stick against which other procedures must be measured.[8]

The *Douglas* Court itself, in its exercise of restraint, spoke only of the situation before it, offer-

---

[7] *Id.* The "unconstitutional line . . . between rich and poor" was among the quotations referred to by Justice Rehnquist.

[8] It must be noted, though, what the *Ross* Court did not say when evaluating the direction in which it would proceed from *Douglas.* It specifically did not find *Douglas* in itself to be any sort of line that would delineate the sole boundary that could not be crossed, and inversely, imply acceptance of any system that approached, but did not equal, the severe example in *Douglas.* "The question is not one of absolutes, but one of degrees." *Ross, supra* at 612.

ing little insight into such degrees. Thus, we turn to the rationale of the *Ross* Court for tools to evaluate and measure this question of degree.

In approaching this question, Justice Rehnquist first offered an in-depth review of the procedure of the North Carolina Supreme Court, previously noted. These procedures are similar to those of our own Court.[9] The question to be answered in determining whether the North Carolina Supreme Court would grant discretionary review was not the correctness of the result or the rationale evidenced below, but rather the importance of the case to the state's jurisprudence. Indeed, though our own court rule specifically recognizes clear error and manifest injustice as potential bases supporting intervention, no equivalent provision was found for the North Carolina Supreme Court.[10] Accordingly, the North Carolina Supreme Court was confined to the importance of the legal principles present in a case, rather than the particular merits of the case itself. This distinction was soon to be persuasive for *Ross*. Before returning to the function of North Carolina's discretionary review, however, Justice Rehnquist came to the determination required under *Douglas*: whether the degree of restriction imposed on a defendant by the denial of counsel for a discretionary review would leave the indigent defendant with only a meaningless ritual, though a moneyed defendant would have a meaning-

---

[9] See note 6 and accompanying text.

[10] Compare MCR 7.302(B)(5), note 6 *supra*, with NC Gen Stat 7A-31(c), quoted in *Ross, supra* at 613-614.

ful appeal.[11] If so, then an "unconstitutional line" would have been drawn.

On the other hand, as also recited by Justice Rehnquist, the Fourteenth Amendment "does not require absolute equality or precisely equal advantages." *Ross, supra* at 612, quoting *San Antonio Ind Sch Dist v Rodriguez*, 411 US 1, 24; 93 S Ct 1278; 36 L Ed 2d 16 (1973). Likewise, the state is not required to "equalize economic conditions," *id.*, quoting *Griffin, supra* at 23 (Frankfurter, J., concurring), nor to be "free from unreasoned distinctions."[12]

Thus, the "question of degree" requires measurement. To determine where the difference between the counseled application of a moneyed defendant and the uncounseled application of the indigent lies, Justice Rehnquist turned to the question most important to an appellate court, and one it is well positioned to answer. That is, whether the materials in the uncounseled application are sufficient to be helpful to the Court in reaching a decision.

---

[11] Recall, again, the question is one of degrees, not absolutes. Nothing in *Ross* suggests that only comparisons as one-sided as that in *Douglas* suffice to show the existence of an "unconstitutional line."

[12] *Id.*, quoting *Rinaldi v Yeager*, 384 US 305, 310; 86 S Ct 1497; 16 L Ed 2d 577 (1966). The majority suggests differences between trial and guilty-plea defendants as appropriate reasons for distinctions under the scheme it imposes. Such arguments miss the point of *Ross*. As the *Ross* Court noted, the distinctions within our system are not required to be "reasoned," and the converse might even be acceptable, provided that the dictates of *Douglas* and *Ross* are not violated. Indeed, it is telling that in neither *Douglas* nor *Ross* did the Court trouble with the reasons for the distinctions, looking instead to the distinctions' effect on the meaningfulness of indigent defendants' appeals. Many distinctions may be drawn between trial and guilty-plea appeals, but when they are advocated as appropriate reasons to depart from the constitutional mandates in *Douglas* and *Ross*, they must fail.

The facts show that respondent, in connection with his Mecklenburg County conviction, received the benefit of counsel in examining the record of his trial and in preparing an appellate brief on his behalf for the state Court of Appeals. Thus, prior to seeking discretionary review in the state Supreme Court, his claims had "once been presented by a lawyer and passed upon by an appellate court." We do not believe it can be said, therefore, that a defendant in respondent's circumstances is denied meaningful access to the North Carolina Supreme Court simply because the State does not appoint counsel to aid him in seeking review in that court. *At that stage he will have, at the very least, a transcript or other record of the trial proceedings, a brief on his behalf in the Court of Appeals setting forth his claims of error, and in many cases an opinion by the Court of Appeals disposing of his case.* These materials, supplemented by whatever submission respondent may make pro se, would appear to provide the Supreme Court of North Carolina with an adequate basis for its decision to grant or deny review. [*Ross, supra* at 614-615 (internal citations omitted; emphasis added).]

Therefore, the *Ross* Court's focus was, and hence ours must be, whether the materials available to an indigent defendant, without the benefit of counsel, would be adequate to allow a court to determine whether to grant further review. We must compare the situation in *Ross* to what could come to be in the instant case, and what has come to be under the scheme imposed by the majority.

In the instant case, an indigent defendant is faced, by law, with only the ability to apply for leave to our Court of Appeals, and is now required to do so without the benefit of appointed counsel. He will have a transcript of the trial court proceedings. This is not all that he must have to offer our Court of Appeals, however; more is required for that Court's "basis for its decision to grant or deny review." *Id.* at 615.

Return to the language above from *Ross*, and in particular, its italicized portions. Applying the dictates of our Supreme Court to the facts of the instant case, we need add but one word to describe the instant defendant's situation, which we shall bracket:

> *At that stage he will* [not] *have, at the very least, . . . a brief on his behalf in the Court of Appeals setting forth his claims of error, and in many cases an opinion by the Court of Appeals disposing of his case.*[13]

Thus, rather than being comparable to the situation in *Ross*, the question before us presents a situation almost completely inapposite. Our Court of Appeals

---

[13] In fact, in guilty-plea cases, the defendant likely would not have any sort of opinion "disposing of his case" on which to either focus or dispute. Perhaps certain sentencing guidelines challenges might be preserved in the record, but little else would be. Should an indigent defendant move to withdraw his plea or move for resentencing, and cite a purported error, he might, but would not necessarily, be favored with an opinion from the trial court disposing of his claim.

Under the majority decision, the situation before this Court will certainly change as well. Under its decision, the path to this Court would certainly change. The practice of our Court of Appeals, when denying applications for leave to appeal, is to do so by order, stating only that the application is "denied for lack of merit in the grounds presented." Thus, unless an indigent defendant were successful below, he would never have a Court of Appeals opinion to present in applying for leave to appeal before this Court. Further, under the majority decision, neither an indigent defendant in Proposal B cases nor the record of his case would arrive before this Court with any brief of counsel or even an identification by counsel of the issues. All this Court would have to review would be the "barren record," along with whatever efforts might have been made by appointed trial counsel. Those who expect the decision today to save judicial resources are likely to soon face a far different reality as courts and judges, at least those compelled to fulfill their legal duty, will find themselves forced to confront voluminous records that have not had meritless issues weeded out or areas upon which courts might focus identified. Arguably, in such a scenario, the acceptability of this Court's practices under *Ross* could become quite questionable. The majority's decision will affect not just the practice of guilty-plea defendants before the Court of Appeals, but the access such defendants have to all levels of our appellate system.

will have no brief, or even an identification of issues, by any counsel for the defendant. It will have, in nearly all instances, nothing in the way of an opinion of the court below on any substantive matter.[14] Thus our Court of Appeals will have only the record before it, along with "whatever submissions respondent might make pro se . . . ."[15] It may well have, however, an offering in opposition from the prosecutor, who is free to muster all the resources of the prosecutor's office to oppose the application.[16] This

---

[14] The opinion discussed in *Ross* was from the North Carolina Court of Appeals. It would likely be a detailed and scholarly endeavor, more so than might be offered by most trial courts. In the vast majority of Proposal B cases, however, not even the most meager of trial court opinions would be present. Rather, the "opinion" would be a transcript memorialization of the trial court's oral ruling, which might or might not reveal any authority as its basis, and which might lack discussion of any authority that may be cited. A written opinion would offer a reviewing court considerable insight into the decision below, but appellate courts at any level are familiar with the great variation in trial court oral rulings, and the varying amounts of information they may provide to the appellate court, particularly when the trial court did not perceive the point decided to be of any significance. This is not meant as a criticism of any trial court's oral rulings, but as a recognition that the press of trial court business and the inherent difficulty of a court recognizing its own error often combine to result in oral rulings that offer appellate courts little to assist in appellate review.

[15] *Ross, supra* at 615. It is neither an insult to any defendant, nor a shock to any appellate judge, to suggest that the *Ross* Court's bare mention of any pro se efforts suggests an implicit recognition that many pro se submissions, by virtue of the defendant's lack of legal education and experience, are often of minimal value, and can be difficult to comprehend.

[16] On the other hand, a prosecutor who is aware of trial court error, and yet desires a denial of appeal, might do well to offer nothing to our Court of Appeals. If the error is not readily apparent, the prosecutor can rely on the lack of any identification of the error by the indigent defendant to camouflage the error. Although this might be an effective means of advocacy, it hardly assists the Court of Appeals in deciding whether the application for leave has merit. As in any context, our adversarial system of justice works best when both adversaries are actually present. *People v Ward,* 459 Mich 602, 615, n 2; 594 NW2d 47 (1999) (CAVANAGH, J., dissenting). The system endorsed by the majority effectively prevents the indi-

"question of degrees" between the instant case and *Douglas*, which *Ross* requires us to ask, instead becomes a vain search for distinctions between the instant case and *Douglas*.[17] The degrees separating a "meaningless ritual" from a "meaningful appeal" are substantial, and the degrees separating the tools approved in *Ross* and those present in the instant case are equally substantial. Most importantly, though, in answer to the "question of degrees" *Ross* asks, which determines the constitutionality of the procedure before us, the degrees separating the meaningfulness of an indigent defendant's appeal from that of a moneyed defendant are immense. Applying the analysis in *Ross*, we can ably conclude that the scheme imposed by the majority is unconstitutional under *Ross* because of its failure to separate itself from the gulf that existed between indigent defendants and moneyed defendants in *Douglas*.

Even before we depart from *Ross*, though, we can comfort ourselves that we are indeed correct in our determination by turning to the factors on which the *Ross* Court fortified its conclusion:

> We are fortified in this conclusion by our understanding of the function served by discretionary review in the North Carolina Supreme Court. *The critical issue in that court, as we perceive it, is not whether there has been "a correct adjudication of guilt" in every individual case,* see *Griffin v Illinois,* but rather whether "the subject matter of the

gent defendant from ever being meaningfully present, and could encourage prosecutors to stay away as well, leaving the reviewing court with the "barren record" and no advocacy at all to assist in its determination.

[17] These degrees, of course, are the distinctions required by *Ross*, not the factual distinction between *Douglas* and the instant case, which forms so much of the sand on which the majority opinion is built.

appeal has significant public interest," or whether "the cause involves legal principles of major significance to the jurisprudence of the State," or whether the decision below is in probable conflict with a decision of the Supreme Court. *The Supreme Court may deny certiorari even though it believes that the decision of the Court of Appeals was incorrect, since a decision which appears incorrect may nevertheless fail to satisfy any of the criteria discussed above. Once a defendant's claims of error are organized and presented in a lawyerlike fashion to the Court of Appeals, the justices of the Supreme Court of North Carolina who make the decision to grant or deny discretionary review should be able to ascertain whether his case satisfies the standards established by the legislature for such review.* [*Ross, supra* at 615 (citations omitted; emphasis added).]

Once again, we have added emphasis not only to aid the reader, but also as a tool for analyzing the stark contrast between the system underlying *Ross* and what now exists in our state under the majority decision. Turning to the first italicized section, with but a single modification, I offer the *Ross* logic as it now applies to indigent defendants seeking leave in the Court of Appeals:

> *The critical issue in that court, as we perceive it, is [] whether there has been "a correct adjudication of guilt" in every individual case, see Griffin v Illinois . . . .*

Recall above the Supreme Court's detailed analysis of the jurisdiction and practices of the North Carolina Supreme Court. Consider as well how it compared to the jurisdiction of this Court and MCR 7.302(B). Now, compare it to the jurisdiction and practice of our Court of Appeals. MCR 7.302(B) is applicable only to this Court. The rules applicable to our Court of Appeals are found in subchapter 7.200 of our court

rules. MCR 7.203(B) governs the jurisdiction of the Court of Appeals for appeal by leave:

> (B) Appeal by Leave. The court may grant leave to appeal from:
>
> (1) a judgment or order of the circuit court, court of claims, and recorder's court which is not a final judgment appealable of right;
>
> (2) a final judgment entered by the circuit court or the recorder's court on appeal from any other court;
>
> (3) a final order of an administrative agency or tribunal which by law is appealable to or reviewable by the Court of Appeals or the Supreme Court;
>
> (4) any other judgment or order appealable to the Court of Appeals by law or rule;
>
> (5) any judgment or order when an appeal of right could have been taken but was not timely filed.

Appeal by leave in guilty-plea cases is provided by MCL 770.3(1)(e); MSA 28.1100(1)(e):

> Subject to the limitations imposed by section 12 of this chapter, an aggrieved party shall have a right to appeal from a final judgment or trial as follows:
>
> *       *       *
>
> (e) All appeals from final orders and judgments based upon pleas of guilty or nolo contendere shall be by application for leave to appeal.[18]

Last, MCR 7.205 governs the mechanics of applications for leave to appeal. Of particular note is MCR 7.205(D):

> Decision.

---

[18] Section 12 of this chapter, as referred to in MCL 770.3(1)(e); MSA 28.1100(1)(e), being MCL 770.12; MSA 18.1109, governs appeals taken by the prosecution and is inapplicable to our discussion.

(1) There is no oral argument. The application is decided on the documents filed and, in an appeal from an administrative tribunal or agency, the certified record.

(2) The court may grant or deny the application; enter a final decision; grant other relief; request additional material from the record; or require a certified concise statement of proceedings and facts from the court, tribunal, or agency whose order is being appealed. The clerk shall enter the court's order and mail copies to the parties.

(3) If an application is granted, the case proceeds as an appeal of right, except that the filing of a claim of appeal is not required and the time limits for the filing of a cross appeal and for the taking of the other steps in the appeal, including the filing of the docketing statement (28 days), and the filing of the court reporter's or recorder's certificate if the transcript has not been filed (14 days), run from the date the order granting leave is certified.

(4) Unless otherwise ordered, the appeal is limited to the issues raised in the application and supporting brief.[19]

These quotations are unfortunately voluminous, but this is an inherent difficulty of demonstrating a negative. Neither the statute governing plea-based appeals nor the court rules governing jurisdiction of the Court of Appeals contain any limitation or jurisdictional statement comparable to MCR 7.302(B). More importantly, no authority contains any sort of jurisdictional basis limitation that even resembles that of the North Carolina Supreme Court discussed in *Ross*.[20]

This is so because the Court of Appeals, unlike this Court, or the North Carolina Supreme Court in *Ross*,

---

[19] Appeals of right, referenced in MCR 7.205(D)(3), are governed by MCR 7.203(A) and MCR 7.204. The discussion that appears immediately below the text accompanying this note is equally applicable to these rules.

[20] Likewise, MCR 7.212 governs briefs on appeal before the Court of Appeals. It does not require the advocate to address any requirements similar to those of either MCR 7.302(B) or the North Carolina Supreme Court, as found in *Ross*.

is not limited in such a fashion. Rather, the function
of the Court of Appeals is correcting errors. Thus, the
function of that Court is precisely addressed by *Griffin* and *Douglas*, and conversely not at all by *Ross*.
That function is determining whether there has been
"a correct adjudication of guilt."[21] The very reason
"fortifying" the Court's decision in *Ross* cuts the opposite way in the instant case. The function of our Court
of Appeals is determining the merits. As mentioned in
the notes above, its order denying leave uniformly
states that leave is denied for "lack of merit in the
grounds presented."

Once again, consider the second portion of the
*Ross* fortifying rationale:

> *The Court may deny* [leave] *even though it believes that
> the decision of the* [trial] *court was incorrect.*

The wording of this quotation leaves my editing less
efficient, but it nonetheless contains a lesson. Nothing
in our court rules or statute precludes the Court of
Appeals from denying leave even though it may
believe that the trial court's decision was incorrect.
Loosely defining "incorrect," such a rule might well

---

[21] The majority argues that because we are dealing with guilty-plea
cases, the defendant has already pleaded guilty. Thus, it concludes that
the court is not functioning to determine guilt. That argument, however,
ignores the teachings of the Supreme Court. *Douglas* and *Griffin* focus on
"a correct adjudication of guilt." Entirely aside from the sentencing questions that might be raised, claims of failures to honor plea bargains, coercion in or involuntariness of a plea, or lack of mental capacity to knowingly enter a plea, for example, would all address directly the correctness
of the "adjudication of guilt." As evidenced by our adoption of MCR 6.302,
we have recognized that a mere admission of guilt, even if accompanied
by an absolute and all-knowing certainty, is but one component of a "correct adjudication" under our system.

be appropriate, because it might be uneconomical, even pointless, for the Court of Appeals to correct a trial court decision on a minor point that would not affect the final decision. Likewise, this might be the case when a court below reached a correct result for an incorrect reason. Again, barring other considerations, concerns of judicial economy might counsel against granting leave. In the North Carolina situation considered in *Ross*, the correctness of the decision below was unmentioned and arguably irrelevant under the governing statute, but the function of our Court of Appeals is reviewing the merits and correcting errors made by the lower courts. Thus, any reliance by the majority on the *Ross* Court's logic, and any comparison between the system in *Ross*, and that imposed by the majority, is wholly lacking in reason.

Finally, consider once more the last section of the *Ross* alternative supporting rationale:

> *Once a defendant's claims of error are* [not] *organized and presented in a lawyerlike fashion to the Court of Appeals, the justices of the Supreme Court who make the decision to grant or deny discretionary review should be able to ascertain whether his case satisfies the standards established by the legislature for such review.*

This quotation actually cuts two ways, and both do injury to our system. First, no organization or presentation of the defendant's claims "in a lawyerlike fashion" to the Court of Appeals will occur in the absence of counsel. That Court will have no assistance from the indigent defendant's corner, save whatever efforts he might make pro se. Moreover, whatever he offered to the trial court would be just that, offered to the trial court. At times, "making a record for appeal" could actually work on the basis of trial court offer-

ings. More common, though, are those errors that are less than apparent at the trial court level. To the extent that they are apparent, time to research and accurately marshal the law may not be. On some occasions, these errors may not be perceived at all, and be apparent only when the record is reviewed by a trained eye.

Second, as the quotation might be more readily understood, the justices of this Court would similarly face a lack of organized and supported claims of error on which to make a decision. We would be called on, were we to fulfill our duty, to review the application in each case to attempt to determine what the claims are. Then, we would have to turn to the record and attempt to locate the perceived source of errors, most likely without the benefit of citation, and finally to research the law to determine whether the claim is indeed justified. Further, that presumes we would confine ourselves only to those errors claimed by the pro se indigent defendant.

In the face of the above, this Court would certainly take a more efficient approach. It would strictly enforce the familiar rule that a litigant may not simply claim error and leave us to research the law. *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959). It would refuse, even as it does now, to consider unpreserved errors, regardless of possible or apparent merit, and enforce the Court's complex procedural and filing requirements.

As it takes each docket-clearing step, however, this Court would widen the gulf between a meaningful presentation of an appeal and a meaningless ritual of denial of leave. With each procedural denial, this Court will further fortify the barricade before the

door that grants admission. Each passing day an order will move this Court ever closer to ripping from under itself the support that kept the North Carolina Supreme Court's system in *Ross*, and our own system before the instant decision, within constitutional boundaries.

We are as bound by our constitution and *Ross* as our Court of Appeals, and equally likely, following the instant decision, to be forced to choose between sifting through an immense burden of pro se applications and taking actions that will immeasurably increase the gap between moneyed and indigent defendants.[22] To be faithful to our oath, Michigan appellate judges will shoulder a significant burden. The alternative is to further prove what is likely in any event, that with the instant decision, this Court has undercut *Ross* so much that this Court's own review will lack an adequate basis when an indigent defendant appears before this Court. The constitutional harbor offered by *Ross* will have dried up, and I welcome the review that drought will bring.

Finally, then, I could move on from *Ross*. Done with our journey we could be, the path clearly marked. Yet, I cannot, for with each citation by the majority of the "discretionary" nature of guilty-plea review, I face the grim realization that the Court has chosen to ignore the teachings of our Supreme Court, and instead has tried to pigeonhole the instant case into either a *Douglas* or *Ross* pre-formed box.

---

[22] Amicus curiae Michigan Assigned Appellate Counsel System informs us that ninety-two percent of all convictions in Michigan result from guilty pleas. Thus, this Court will see a significant number of completely pro se offerings, or even worse, no offerings at all, a certain indication that the door to this Court has been slammed in the face of indigent Proposal B defendants.

Because it fits neither exactly, the majority concludes that it is free to decide this case as it chooses. Faced with this steadfast resistance to the language, logic, and authority of *Douglas* and *Ross*, I turn to a multitude of other cases, each of which reverberates with warning that the majority has left the designated road.

### D. *UNITED STATES v MacCOLLOM*: CONSIDERABLE ASSISTANCE

As appellate judges, we do not have the blessing of requesting instructions from superior courts when we do not understand their decisions. Rather, we are left with only the Court's written opinion; and when a point is less than clear, we are left with more in the way of academic debate than clarification from above. A chance for restatement occurs only when the higher court has the opportunity and again feels the need to address a similar area of law. Therefore, those who have misunderstood *Ross* should be grateful for the opportunity presented the Supreme Court in *United States v MacCollom*, 426 US 317; 96 S Ct 2086; 48 L Ed 2d 666 (1976).

*MacCollom* dealt not with a question of the right to counsel, but rather with the right to a transcript. Although that issue might seem, after *Griffin* and *Draper v Washington*, well settled, *MacCollom* dealt with an indigent prisoner seeking a transcript to prepare his petition for habeas corpus relief from a federal conviction. Under normal circumstances, a transcript would probably have been prepared in the course of that defendant's direct appeal, but he had apparently elected to allow his direct appeal rights to

expire without taking any action. Thus, no transcript had been prepared.

Because it dealt with a collateral rather than a direct appeal, such a question might seem to have little import for the instant case. Justice Rehnquist, in his lead opinion,[23] began with a review of the Court's decisions in *Douglas* and *Ross*. *MacCollom* was issued just two years after *Ross*, so it offers a fair barometer of how both the author and several members of the Court understood *Ross* when it was of recent vintage.

Justice Rehnquist, in his analysis of the equal protection issue, had cause to revisit both *Douglas* and his opinion in *Ross*:

> In *Douglas v California, supra*, the Court held that the State must provide counsel for an indigent on his first appeal of right. But in *Ross v Moffitt, supra*, we declined to extend that holding to a discretionary second appeal from an intermediate appellate court to the Supreme Court of North Carolina. We think the distinction between these two holdings of the Court is of considerable assistance in resolving respondent's equal protection claim. Respondent in this case had an opportunity for direct appeal, and had he chosen to pursue it he would have been furnished a free transcript of the trial proceedings. But having forgone that right, and instead some years later having sought to obtain a free transcript in order to make the best case he could in a proceeding under [28 USC] § 2255, respondent stands in a different position. [*MacCollom, supra* at 324-325.]

---

[23] *MacCollom* was a plurality decision, with Justice Rehnquist's lead opinion joined by Chief Justice Burger and Justices Stewart and Powell. *MacCollom, supra* at 319. Justice Blackmun concurred separately, and made the interesting point that counsel was appointed on this collateral challenge. *Id.* at 329. Justice Brennan, joined by Justice Marshall, dissented. *Id.* at 330. Justice Stevens, joined by Justices Brennan, Marshall, and White, also offered a dissenting opinion. *Id.* at 334.

Justice Rehnquist, and those joining his opinion, found the distinctions between the acceptable situation in *Ross* and the unacceptable one of *Douglas*, when compared to the facts of *MacCollom*, offered considerable assistance. These same distinctions have come to the fore in the Supreme Court's analysis in subsequent cases, a pattern that offers us guidance, but guidance for which the majority has no use.

### E. *EVITTS v LUCEY*: ANOTHER LESSON IN DISTINCTIONS

In *Evitts v Lucey*, 469 US 387; 105 S Ct 830; 83 L Ed 2d 821 (1985), the Court was called on to determine whether the right to assistance of counsel on a first appeal included a right to effective assistance of counsel. An indigent defendant, following conviction, had counsel appointed for his first appeal. Counsel failed to comply with the applicable Kentucky court rules, and the appellate court dismissed the defendant's appeal. The defendant sought habeas corpus relief, claiming the dismissal was unconstitutional because it deprived him of a claimed right to effective assistance of counsel. See *id.* at 389-391.

The Supreme Court agreed with the defendant. It noted that "[j]ust as a transcript may by rule or custom be a prerequisite to appellate review, the services of a lawyer will for virtually every layman be necessary to present an appeal in a form suitable for appellate consideration on the merits." *Id.* at 393. The essence of the Court's rationale, though referring to a right to effective assistance of counsel, is nonetheless applicable to, and based on an express acknowledgment of, the right to any counsel at all:

> In bringing an appeal as of right from his conviction, a criminal defendant is attempting to demonstrate that the conviction, with its consequent drastic loss of liberty, is unlawful. To prosecute the appeal, a criminal defendant must face an adversary proceeding that—like a trial—is governed by intricate rules that to a layperson would be hopelessly forbidding. An unrepresented appellant—like an unrepresented defendant at trial—is unable to protect the vital interests at stake. [*Id.* at 396.]

Most importantly, one question confronting the Supreme Court was whether the appeal Kentucky granted was of right or discretionary. The commonwealth argued that the appeal was permitted only if it complied with applicable rules, and thus, under *Ross*, it was a discretionary appeal. Rejecting that argument, the Court further charted the path taken by our analysis of the *Ross* "fortifying" rationale:

> Unlike the appellant in the discretionary appeal in *Ross*, a criminal appellant in the Kentucky Court of Appeals typically has not had the benefit of a previously prepared trial transcript, a brief on the merits of the appeal, or a previous written opinion. In addition, petitioners fail to point to any source of Kentucky law indicating that a decision on the merits in an appeal like that of respondent—unlike the discretionary appeal in *Ross*—is contingent on a discretionary finding by the Court of Appeals that the case involves significant public or jurisprudential issues; the purpose of a first appeal in the Kentucky court system appears to be precisely to determine whether the individual defendant has been lawfully convicted. In short, a criminal defendant bringing an appeal to the Kentucky Court of Appeals has not previously had "an adequate opportunity to present his claims fairly in the context of the State's appellate process." It follows that for purposes of analysis under the Due Process Clause, respondent's appeal was an appeal as of right, thus triggering the right to counsel recognized in *Douglas v California*. [*Id.* at 401-402 (citations omitted).]

The Court's final discussion is also worthy of note:

> The lesson of our cases, as we pointed out in *Ross*, is
> that each Clause triggers a distinct inquiry: " 'Due Process'
> emphasizes fairness between the State and the individual
> dealing with the State, regardless of how other individuals
> in the same situation may be treated. 'Equal Protection,' on
> the other hand, emphasizes the disparity in treatment by a
> State between classes of individuals whose situations are
> arguably indistinguishable." In cases like *Griffin* and *Doug-
> las*, due process concerns were involved because the States
> involved had set up a system of appeals as of right but had
> refused to offer each defendant a fair opportunity to obtain
> an adjudication on the merits of his appeal. Equal Protec-
> tion concerns were involved because the State treated a
> class of defendants—indigent ones—differently for pur-
> poses of offering them a meaningful appeal. Both of these
> concerns were implicated in the *Griffin* and *Douglas* cases
> and both Clauses supported the decisions reached by the
> Court. [*Id.* at 405 (citations omitted).]

On the other hand, the dissent in *Evitts* disagreed
with any reliance on the due process clause.

Given the dispute in *Evitts*, the place of a due pro-
cess analysis in the instant case is subject to aca-
demic disagreement. However, the Court believed a
due process analysis was applicable, perhaps because
even though the defendant was challenging his con-
viction, he was in a lesser position than the defendant
in *Ross*, whose "claims had 'once been presented by a
lawyer and passed upon by an appellate court,' "
*Ross, supra* at 614-615, quoting *Douglas, supra* at
356, and thus more akin to the defendant in *Douglas*,
in which the Court concluded that due process con-
cerns were present. See 3 LaFave, Israel & King,
Criminal Procedure (2d ed), § 11.1(b), p 474.
Whatever the role of the Due Process Clause, I have

no difficulty applying an equal protection analysis to the instant case, and conclude that the system imposed by the majority leaves moneyed defendants with a meaningful appeal, but leaves indigent defendants with a meaningless ritual.[24] The Court's discussion in *Evitts*, though, suggests that the majority's analysis is infirm under both clauses.

### F. *MURRAY v GIARRATANO*: THE PATH STRAIGHTENS

By now we have crested the hills on our path, and can see its direction onto the horizon. Yet the wayward majority refuses to pause and seek directions, insisting that it understands *Douglas* and *Ross* "in the context in which those cases were decided," *ante* at 519, without understanding the context in which the Supreme Court has understood those same cases. To illustrate the majority's error, we continue on with our journey.

In the years following *Ross*, Chief Justice Rehnquist was called upon to again revisit the essence of the *Ross* Court's holding. In *Murray v Giarratano*, 492 US 1; 109 S Ct 2765; 106 L Ed 2d 1 (1989),[25] a case involving a claim by indigent death row inmates for appointed counsel for state postconviction proceedings, Chief Justice Rehnquist wrote:

---

[24] Any suggestion that this equal protection analysis is incomplete because it does not visit entryway questions, like suspect classifications or levels of review, is mistaken. These considerations' absences are not inadvertent. Rather, I note that these concerns were given no place in the Supreme Court's analysis in *Douglas, Ross*, or the cases that followed them.

[25] Like *MacCollom, Murray* was a plurality decision. Justices White, O'Connor, and Scalia joined Chief Justice Rehnquist's lead opinion. Justice O'Connor also concurred separately, *Murray, supra* at 13, as well as joining Justice Kennedy's separate concurrence. *Id.* at 14. Justice Stevens, joined by Justices Brennan, Marshall, and Blackmun, dissented. *Id.* at 18-20.

> The Sixth and Fourteenth Amendments to the Constitution assure the right of an indigent defendant to counsel at the trial stage of a criminal proceeding, *Gideon v Wainwright,* 372 US 335 [82 S Ct 792; 9 L Ed 2d 799 (1963),] and an indigent defendant is similarly entitled as a matter of right to counsel for an initial appeal from the judgment and sentence of the trial court. *Douglas v California,* [*supra*]; *Griffin v Illinois,* [*supra*]. But we held in *Ross v Moffitt, supra* at 610, that the right to counsel at these earlier stages of a criminal procedure did not carry over to a discretionary appeal provided by North Carolina law from the intermediate appellate court to the Supreme Court of North Carolina. [*Murray, supra* at 7.]

Two points are apparent. The first is the by-now familiar distinctions between an initial and later appeal that were central to the holding of *Ross.* Second is that nowhere in this statement is found a limitation that the initial appeal must be "of right" for counsel to be required.[26] Considering the foundations of *Ross,* and the "fortifying" justifications that have now become central to any discussion of that decision, this appears neither surprising nor inadvertent.

The majority notes, in apparent reference to *Murray,* that the Supreme Court has not extended the right to counsel, "even in the case of inmates on death row." *Ante* at 520. Similarly, attempting to imply

---

[26] Similar is *Smith v Robbins, supra,* 120 S Ct 759, in which the Court understood *Douglas* to hold that "decision of first appeal 'without benefit of counsel, . . . no matter how meritorious [an indigent's] case may turn out to be' discriminates between rich and poor rather than between 'possibly good and obviously bad cases,'" quoting *Douglas, supra* at 357. Also notable is the Court's statement that an indigent defendant is not deprived of a fair opportunity to bring an appeal if the appeal is determined to be frivolous, because "fairness does not require either counsel or a full appeal once it is properly determined that an appeal is frivolous." *Robbins, supra,* 120 S Ct 760. Under the system in place after the majority's decision, however, counsel will be denied indigent defendants before their appeal is determined frivolous, without merit, or otherwise, because counsel will not be appointed at all for an indigent's attempt to garner appellate review.

that its action is commonplace, it notes that other states have moved away from appeals of right in guilty plea cases. *Id.* at 504, n 3. No authority prevents states from doing so, but with regard to the provision of counsel in such cases, or in the mentioned capital cases, it is imperative to recall that whenever the Court has mentioned *Ross*, a discussion of the presence of the intermediary appellate step inevitably follows. The presence of counsel on that intermediary step has been the reason the Court has denied counsel in later steps.[27] After the majority's decision, indigent Proposal B defendants will go without counsel on their first appeal to an intermediate appellate court, and the reason the Supreme Court has relied on to deny counsel vanishes from the horizon.

### G. *MATA* AND *BILLOTTI*: PREVIOUS TRAVELERS ON THIS PATH

For a moment, I will pause in my review of Supreme Court decisions to consider a few more indications that the majority has indeed gone astray. Each of these offers an insight into a particular problem with the majority decision, and the system we will come to know in Michigan.

---

[27] See, e.g., *Pennsylvania v Finley*, 481 US 551; 107 S Ct 1990; 95 L Ed 2d 539 (1987), also discussing appointed counsel for postconviction proceedings. The Court again had occasion to review its reasoning in *Ross*, and Chief Justice Rehnquist again offered the approach that he had consistently used to discuss *Ross*:

By the time respondent presented her application for postconviction relief, she had been represented at trial and in the Supreme Court of Pennsylvania. In *Ross*, we concluded that the defendant's access to the trial record and the appellate briefs and opinions provided sufficient tools for the pro se litigant to gain meaningful access to courts that possess a discretionary power of review. [*Id.* at 557 (citations omitted).]

In *Finley*, the Court continued its longstanding practice of comparing the appellant's position to the position of the defendant in *Ross* to determine whether counsel must be appointed.

### 1. *MATA v EGELER*

In *Mata v Egeler*, 383 F Supp 1091 (ED Mich, 1974), the United States District Court for the Eastern District of Michigan held that an indigent defendant filing a delayed application for leave to appeal after failing to file a timely appeal as of right was entitled to the appointed appellate counsel. Although the defendant in *Mata* had pleaded guilty, at that time he was entitled to an appeal of right. Nevertheless, because of his nonnegligent delay in filing such an appeal, he was left with only an appeal by leave to the Michigan Court of Appeals. Thus, the defendant in *Mata* was in precisely the same situation as the instant defendant.

*Mata* was decided shortly after the decision in *Ross*, and the district court showed the benefit of having both that opinion and *Douglas* available:

> It is "invidious discrimination" for the Michigan Court of Appeals to consider the merits of an indigent's first late appeal without benefit of counsel while allowing a rich man to employ counsel. The "relative handicap" Michigan indigents face when applying for leave to appeal is even greater than the handicap petitioners faced in *Douglas*. There, the California appellate court independently examined the record before concluding that "no good whatever could be served by appointment of counsel." Here, the only person examining the record for possible errors is petitioner—an indigent untrained in law. Furthermore, Mata's appeal is discretionary rather than as of right; if he fails to persuade the Court of Appeals his case has merit, he will not receive his first appeal, as petitioners in *Douglas* would have. While one can distinguish the principal case from *Douglas*—the appeal in the principal case is discretionary, whereas in *Douglas* it was as of right—in the context of the Michigan appellate system, this is a distinction without a difference. Whether the appeal is as of right or discretionary is irrelevant if "indigents are . . . denied meaningful access to that system because of their poverty. *Ross v Moffitt* . . . ."

The nature of discretionary review in the Michigan Court of Appeals differs substantially from the limited review available to Moffitt in the North Carolina Supreme Court. By statute Michigan gives late filing but non-negligent petitioners a route back to the appellate system. Yet, "meaningful access" to this system is denied indigents: they are forced to travel this route without a vehicle. Unlike Moffitt, Mata has not been assisted by counsel at any stage of appeal. Until an attorney scrutinizes the record and prepares argument for appeal, the Court of Appeals does not have an "adequate basis on which to base its decision to grant or deny review." Although the state procedure does not completely foreclose petitioner from presenting his claims to the Michigan appellate courts, depriving him of counsel at the initial review, simply because of his indigency, will degrade the entire appellate process to a "meaningless ritual." [*Id.* at 1093-1094.]

The district court, only a few short months after *Ross* was issued, follows a track in its opinion paralleling what would emerge in so many later opinions of the United States Supreme Court.[28] That alone

---

[28] The First Circuit Court of Appeals followed this track in *Bundy v Wilson*, n 2 *supra*, as well. There, the court grasped the fundamental concept involved here, that it is not the name of the appellate system, but its place in the appellate chain, that is dispositive:

In *Ross*, the Supreme Court ruled that due process and equal protection did not require the State of North Carolina to provide an indigent defendant with counsel in a discretionary appeal to the state supreme court. Vital to the Court's reasoning was its recognition that North Carolina did provide counsel to criminal defendants who pursued their automatic right of appeal to the state's intermediate appellate court. Thus, the crucial distinction advanced in *Ross* is not between discretionary appellate systems and automatic appellate systems. Rather, the key difference considered in both *Evitts* and *Ross* concerned the nature of constitutional protections in a single system which employed both a first appeal as of right to an intermediate court, and a subsequent discretionary appeal to the state supreme court. Indeed, the distinction between a first appeal of right and subsequent discretionary appeal within the same appellate system has been made by the Court in other cases. The Court,

makes the opinion of the district judge remarkable for its insight.[29] The majority does not even consider the guidance of *Mata*, but marches onward to deny counsel to indigent defendants.

## 2. *BILLOTTI v LEGURSKY*

No authority suggests that providing only an appeal by leave in guilty plea, or any other, cases would be constitutionally infirm. Indeed, states have discretion to deal with difficult problems of policy. However, authorities do provide that states cannot deny a meaningful appeal to an indigent defendant when it is allowed for a moneyed defendant. The United States Court of Appeals for the Fourth Circuit has suggested that the system set up by the majority today may effectively expose the whole of Proposal B to constitutional difficulty.

In *Billotti v Legursky*, 975 F2d 113 (CA 4, 1992), the court reviewed the appellant's claim that the West

---

however, has not drawn a line between discretionary appellate systems and automatic appellate systems for the purpose of gauging the degree of due process protection owed a criminal appellant. [*Bundy, supra* at 130 (citations omitted).]

[29] The Eastern District of Michigan displayed the same insight on the same issue recently in *Tesmer v Granholm*, unpublished opinion of the United States District Court for the Eastern District of Michigan, issued March 31, 2000 (Docket No. 00-CV-10082). That court held that denying appellate counsel to indigent Proposal B defendants is a constitutional violation. The court stated:

[I]n holding that a State need not appoint appellate counsel for a discretionary appeal to the State's highest court, the Supreme Court [in *Ross*] could not have been more clear that that distinction was based upon the fact that an attorney had been appointed at the intermediate level, had reviewed the record and had prepared the appellate arguments. Without that initial review, the indigent defendant's appeal was a meaningless ritual. [Slip op at 38.]

Virginia system, in which "the Supreme Court of Appeals provides the sole avenue of appellate review from courts of general jurisdiction" was unconstitutional because it denied him an appeal of right. *Id.* at 115. The decision to grant review was discretionary with the West Virginia court. *Id.* Even so, the state provided extensive appellate procedural protections:

> Nonetheless, the right to petition for appeal to the Supreme Court of Appeals is accompanied by an array of procedural protections. These procedural protections mirror the requirements that the United States Supreme Court has held to be mandatory when a state grants appeal as of right. The right to petition is guaranteed under W VA Const, Art VIII, § 4, and denial of that right renders the conviction void. *State v Eden*, 163 W Va 370; 256 SE2d 868, 875 (1979). Indigent criminal defendants are entitled to court-appointed counsel for their petition. *Rhodes v Leverette*, 160 W Va 781; 239 SE2d 136, 140 (1977). Accord *Douglas v California*, 372 US 353; 83 S Ct 814; 9 L Ed 2d 811 (1963). Counsel's performance must meet constitutional standard of effectiveness. *State ex rel Bratcher v Cooke*, 155 W Va 850; 188 SE2d 769 (1972). Accord *Evitts v Lucey*, 469 US 387 (1985). Criminal defendants are entitled to a transcript for appeal. *State ex rel Johnson v McKenzie*, 159 W Va 795; 226 SE2d 721, 724 (1976). Accord *Griffin v Illinois*, 351 US 12; 76 S Ct 585; 100 L Ed 891 (1956). West Virginia has thus provided Billotti with the same resources for discretionary review that the Supreme Court has held are required in cases involving appeal as of right.

*    *    *

Petitioner's counsel has also conceded that the relevant procedural safeguards were observed here—Billotti's counsel filed a substantial petition on Billotti's behalf, accompanied by the transcript, and made an oral presentation

before all of the justices of the Supreme Court of Appeals. [*Billotti, supra* at 115-116.][30]

The court relied on the presence of these protections to dispose of Billotti's claim:

> It is plain that West Virginia has afforded Billotti an adequate opportunity to challenge the alleged errors in his trial. The Fourteenth Amendment does not authorize the federal courts to micromanage state criminal justice systems. In our federal system, the states are allowed to structure their systems of criminal justice as they see fit, *as long as their systems satisfy the basic demands of due process.* . . . It is enough that they serve the needs of the state which adopted them, and *that they afford an ample measure of procedural fairness to criminal defendants seeking an appeal.* [*Id.* at 116 (citations omitted; emphasis added).]

Thus, although the question is not as well defined as some that are raised by the majority's decision in the instant case, it is arguable that, if review of the constitutionality of a system that offers only appeal by leave is to be decided as the Fourth Circuit believes, the presence or absence of counsel's assistance in the appellate process, whatever that process is called, is a crucial component of the system's constitutionality.[31] Through its decision, the majority has left that component of Michigan's system by the roadside, and invites a challenge not only to the denial of

---

[30] Notably, the procedural rules governing the petition for leave to appeal before the West Virginia Court are essentially identical to the applicable provisions governing an application for leave to appeal to our Court of Appeals. Compare W Va R App P 3(c), cited in *Billotti, supra* at 116, with our own MCR 7.205 and MCR 7.212.

[31] See also *Billotti, supra* at 116-117, stating that whether a procedure for appeal is by leave or by right may have little effect on the nature of the actual review, and suggesting that evaluation of the nature of that review might be more appropriate.

counsel, but to the whole of Proposal B, which Michigan approved.

II

The United States Supreme Court and the lower federal courts have compared the position of appealing defendants to the position of the defendant in *Ross* when determining whether counsel must be appointed. In cases including *MacCollom, Murray,* and *Pennsylvania v Finley,* 481 US 551; 107 S Ct 1990; 95 L Ed 2d 539 (1987), the Supreme Court has denied indigent defendants counsel in second-tier appeals and postconviction proceedings because counsel has been present in first appeals, in accord with *Douglas.* When counsel has not been present on a first appeal, as in *Mata,* the courts have appointed counsel. By its decision, the majority denies indigent defendants any counsel at all on appeal. In lieu of an indigent defendant's right to counsel on a first appeal, the majority offers indigent defendants assurances that the trial court proceedings in guilty plea cases will be so simple that the indigent defendants will not need any appellate counsel, and even if they did, their trial counsel will already have acted as appellate counsel. Although distinctions can be drawn between guilty plea and trial cases, when they are offered as a reason to depart from the constitutional mandates in *Douglas* and *Ross,* they fail. Similarly, comparing the position of a Proposal B defendant with that of the defendant in *Ross* finds the former woefully under equipped to have "meaningful access" to our Court of Appeals.

### A. THE "SIMPLICITY" OF GUILTY PLEA PROCEEDINGS

The majority believes that because a defendant has pleaded guilty, guilt is then beyond question and a court does not function to determine whether that is accurate. It then concludes that it can deny counsel because "[t]he distinct character of plea proceedings . . . will 'make this relative handicap far less than the handicap borne by the indigent defendant denied counsel on his initial appeal as of right,' from a trial conviction." *Ante* at 520-521, quoting *Ross*, *supra* at 616 (citation omitted). By sandwiching this quotation from *Ross* between its own modifiers, the majority exemplifies its error, relying on snippets from *Ross* without accounting for its reasoning that counsel could be denied on a discretionary appeal following an appeal where counsel was provided. A point that the majority does not choose to quote from *Douglas* and *Ross* is that both cases focus on "a correct adjudication of guilt."

First, a "correct adjudication of guilt" involves more than just an admission of guilt. Claims of failures to honor plea bargains, coercion or involuntariness of a plea, or lack of mental capacity to knowingly enter a plea, for example, all address the correctness of the "adjudication of guilt." As evidenced by our adoption of MCR 6.302, we have long recognized that a mere admission of guilt, even if accompanied by an absolute and all-knowing certainty, is but one component of a "correct adjudication of guilt" under our system.

Further, although the majority notes the claims that are waived by a guilty plea, many others remain appealable, and deal with a "correct adjudication of

guilt." Even though he pleads guilty, an indigent
defendant can still appeal constitutional defects that
are irrelevant to his factual guilt, *People v Webb*, 89
Mich App 50, 54; 279 NW2d 573 (1979), double jeop-
ardy claims requiring no further factual record, *People
v Johnson*, 396 Mich 424, 444; 240 NW2d 729 (1976),
jurisdictional defects, *id.*, challenges to the suffi-
ciency of the evidence at the preliminary examina-
tion, *People v Schaffer*, 129 Mich App 287, 290; 341
NW2d 507 (1983), preserved entrapment claims, *Peo-
ple v White*, 411 Mich 366, 387; 308 NW2d 128 (1981),
mental competency claims, *People v Parney*, 74 Mich
App 173, 176; 253 NW2d 698 (1977), factual basis
claims, *People v Mitchell*, 431 Mich 744, 748; 432
NW2d 715 (1988), claims that the state had no right to
proceed in the first place, including claims that a
defendant was charged under an inapplicable statute,
*People v Beckner*, 92 Mich App 166, 169; 285 NW2d 52
(1979), and claims of ineffective assistance of coun-
sel. See *People v Haynes (After Remand)*, 221 Mich
App 551, 558; 562 NW2d 241 (1997); *People v Harris*,
148 Mich App 506, 512; 384 NW2d 816 (1986); *People v
Snyder*, 108 Mich App 754, 755-756; 310 NW2d 868
(1981).[32]

In addition to these claims, our Legislature recently
enacted law providing for appeals of sentencing deci-
sions. The statute itself, MCL 769.34(7)-(10); MSA

---

[32] Additionally, authorities are conflicting about whether other claims
are waived by a guilty plea. For example, Michigan cases are unclear
about whether claims under the interstate agreement on detainers, MCL
780.601; MSA 4.147(1), are waived by a guilty plea. Compare *People v
Office*, 126 Mich App 597; 337 NW2d 592 (1983) (not waived), with *People
v Wanty*, 189 Mich App 291; 471 NW2d 922 (1991) (waived). The same is
true for claims of abusive charging. Compare *People v Stevens*, 130 Mich
App 1; 343 NW2d 219 (1983) (waived), with *People v Vannoy*, 106 Mich
App 404; 308 NW2d 233 (1981) (not waived).

28.1097(3.4)(7)-(10), does not address the form of appeal, whether from a trial conviction or a guilty plea conviction. Rather, it evidences the Legislature's intent that both errors in scoring the new legislative guidelines and departures from those guidelines shall be reviewable on appeal, without limiting the review in guilty plea cases.

Despite the matters that can result in error in a guilty-plea case, and the various appellate claims a guilty-pleading defendant can assert, the majority concludes that guilty pleas are so simple, no counsel will ever be necessary for an indigent defendant who wants to appeal. Some plea-based cases may be fairly simple, and appeals from them may be fairly meritless. To apply that presumption wholesale to every plea-based appeal, however, ignores the lessons of the cases our Court of Appeals hears daily.

For example, consider the "simplicity" of the cases discussed below. Although some include variations of the more common claims regarding sentence proportionality, others are considerably more complex, as evidenced in some cases by the Court of Appeals efforts in reaching its conclusions. In each case, defendant pleaded guilty or nolo contendere shortly before Proposal B went into effect, in what would now be a Proposal B case, and in each was represented by appointed counsel. Counsel raised the claims of error described, and garnered the relief described below. Under the Court's decision in the instant case, from now on, a defendant with a similar claim will not be represented by counsel in attempting to raise that claim. Thus, as we proceed through these cases, I am left to wonder how many, if any, of these errors would have come to mind to an attorney

reviewing his own efforts, or to an indigent defendant alone after trial court proceedings conclude and he is left with no appellate counsel whatsoever. If either of these were to fail, then in that case there would not be a "correct adjudication of guilt."

First, in *People v Hazzard*, 206 Mich App 658; 522 NW2d 910 (1994), the juvenile defendant pleaded guilty to two counts of CSC I and was sentenced as an adult to concurrent prison terms of twenty-two to forty years. *Id.* at 659. Through appointed counsel, the defendant argued that the trial court failed to comply with MCR 6.931(E)(3), (4), and MCL 769.1(3), (5); MSA 28.1072(3), (5) by failing to make adequate findings concerning whether the juvenile defendant should have been sentenced as an adult. The Court of Appeals reversed defendant's sentences and remanded for further proceedings before a different trial judge. Under the majority opinion, that juvenile defendant would only be represented by trial counsel, and would have to seek relief from the Court of Appeals on his own.

Consider also *People v Antolovich*, 207 Mich App 714; 525 NW2d 513 (1994). There, following a guilty plea to delivering less than fifty grams of cocaine, the circuit court sentenced defendant to four to twenty years imprisonment, in excess of the guidelines range, a $25,000 fine, and payment of $1,500 in costs. *Id.* at 715. Through appointed counsel, the defendant challenged the trial court's authority to impose the sentence. The Court of Appeals vacated the sentences, holding that the court below was without statutory authority to impose costs, that the fine was constitutionally excessive, and that the prison term was not proportionate under *People v Milbourn*, 435 Mich 630;

461 NW2d 1 (1990). That defendant would now have only trial counsel to represent him in his criminal case.

Similar are several unpublished decisions of the Court of Appeals. In *People v Hill*,[33] the defendant entered a plea bargain that included a provision that his sentence for marijuana possession would run concurrently with his sentence in another case for possession of marijuana with intent to deliver. The Court of Appeals held that the trial court did not have authority to impose concurrent sentences under MCL 333.7401(3); MSA 14.15(7401)(3), and that the trial court should have allowed the indigent defendant to affirm or withdraw his guilty plea before it resentenced him. Thus, the Court of Appeals remanded to allow the defendant that choice. Next, in *People v Perryman*,[34] the circuit court initially sentenced the guilty-pleading indigent defendant to concurrent sentences. Without a hearing, the court then signed a judgment of sentence indicating that the sentences were to run consecutively. The Court of Appeals remanded for resentencing because of the lower court's confusion about the statutory requirement for consecutive sentences, given that "it is not certain that the trial court would have imposed the same sentence had it been aware that MCL 333.7401(3); MSA 14.15(7401)(3) mandates consecutive sentences . . . ." In *People v Bullock*,[35] following the defendant's

---

[33] Unpublished opinion per curiam, issued June 13, 1994 (Docket No. 159022).

[34] Unpublished opinion per curiam, issued August 18, 1995 (Docket No. 179495).

[35] Unpublished opinion per curiam, issued January 5, 1996 (Docket No. 180464).

nolo contendere plea, the circuit court ordered him to pay $108,286.90 in restitution. He was ultimately jailed, in part for failing to pay the restitution. The Court of Appeals held that the lower court failed to consider the factors required by MCL 780.767(1); MSA 28.1287(767)(1) and MCL 780.766(13); MSA 28.1287(766)(13) before setting the restitution amount. After examining conflicting case law, the Court of Appeals determined that the lower court was required to hold an evidentiary hearing on the defendant's ability to pay, so it vacated the restitution order and remanded. In a final example, the defendant in *People v Krieger*,[36] who had a history of mental health problems, including bipolar disorder, acute psychosis, and delusions and hallucinations, pleaded nolo contendere to an uttering and publishing charge, after the court denied a motion for psychiatric evaluation. The Court of Appeals reversed and remanded for a psychiatric evaluation to determine the defendant's competence to enter a plea. It noted the presence of a psychiatric report, prepared as a result of a charge pending against the defendant in another county and dated only nine days before the sentencing in question, which found defendant "in dire need of institutional psychiatric care."

These cases are only a few examples of the types of claims and the types of indigent guilty-pleading defendants that are daily before our Court of Appeals. Nonetheless, the majority concludes with ease that the records in these cases, and others like them, would be so short, simple, and routine that the

---

[36] Unpublished opinion per curiam, issued March 29, 1996 (Docket No. 186926).

defendants in the cases discussed, and others like them, with no appellate counsel whatsoever, will have no trouble gaining access to our Court of Appeals.[37]

### B. PROPOSAL B INDIGENT DEFENDANTS AND *ROSS*

In a further attempt to rehabilitate its constitutional departure, the majority suggests that the materials provided by trial counsel under MCR 6.005(H)(4) will somehow prevent an indigent defendant from having the meaningless ritual that *Douglas* held unconstitutional. I disagree, and offer a careful analysis of each step of this suggestion, an analysis that finds the suggestion unavailing in its attempt to bridge the gap between *Douglas* and *Ross*.

Initially, the relevant points from *Ross*:

> The facts show that respondent, in connection with his Mecklenburg County conviction, received the benefit of counsel in examining the record of his trial and in preparing an appellate brief on his behalf for the state Court of Appeals. Thus, prior to his seeking discretionary review in the State Supreme Court, his claims had "once been presented by a lawyer and passed upon by an appellate court." We do not believe that it can be said, therefore, that a defendant in respondent's circumstances is denied meaningful access to the North Carolina Supreme Court simply because the State does not appoint counsel to aid him in seeking review in that court. *At that stage, he will have, at the very least,* a transcript or other record of trial proceedings, *a brief on his behalf in the Court of Appeals setting forth his claims of error, and in many cases an opinion*

---

[37] Notable are the observations on indigent defendants offered by amicus curiae Michigan Assigned Appellate Counsel System, that eighty percent of indigent defendants do not have a high school education, and half are functionally illiterate. "Giving an illiterate the run of the stacks is like giving an anorexic a free meal at a three-star restaurant." *DeMallory v Cullen*, 855 F2d 442, 451 (CA 7, 1988) (Easterbrook, J., dissenting).

*by the Court of Appeals disposing of his case.* These materials, supplemented by whatever submission respondent may make pro se, would appear to provide the Supreme Court of North Carolina with an adequate basis for its decision to grant or deny review. [*Ross, supra* at 614-615 (internal citations omitted; emphasis added).]

The Court later referred to these materials in *Pennsylvania v Finley, supra,* with Chief Justice Rehnquist again offering the approach that he has consistently used in discussing *Ross*:

Nor was the equal protection guarantee of "meaningful access" violated in this case. By the time respondent presented her application for postconviction relief, she had been represented at trial and in the Supreme Court of Pennsylvania. In *Ross*, we concluded that the defendant's access to the trial record and the appellate briefs and opinions provided sufficient tools for the pro se litigant to gain meaningful access to courts that possess a discretionary power of review. [*Finley, supra* at 557 (citations omitted).]

In discussing *Ross*, and suggesting that counsel need not be provided for a discretionary appeal, the Court predicated its conclusion not on the simple presence of counsel at some point below, but on several distinct factors. By viewing the emphasized portions of *Ross* quoted above, it becomes clear that three separate "tools," to use the *Finley* Court's terms, allowed the Court to conclude that counsel was not necessary on a second-tier discretionary appeal:

*At that stage he will have, at the very least,* [1] a transcript or other record of trial proceedings, [2] *a brief on his behalf in the Court of Appeals setting forth his claims of error, and* [3] *in many cases an opinion by the Court of Appeals disposing of his case.* These materials, supple-

mented by whatever submission respondent may make pro ·
se, would appear to provide the Supreme Court of North
Carolina with an adequate basis for its decision to grant or
deny review. [*Ross, supra* at 615 (internal citations omitted;
emphasis added).]   ·

For confirmation, we can merely recall *Finley*:

In *Ross*, we concluded that the defendant's access to [1]
the trial record and [2] the appellate briefs and [3] opinions
provided sufficient tools for the pro se litigant to gain
meaningful access to courts that possess a discretionary
power of review. [*Finley, supra* at 557 (citations omitted).]

The majority suggests that, if an indigent defendant
proceeded pro se, he would have sufficient tools to
ensure that his efforts to gain discretionary review on
his first appeal would provide meaningful access
rather than a meaningless ritual. Accordingly, con-
sider what the instant indigent defendant will not
have, and compare his position to the pro se defend-
ant in *Ross*, the same comparison the Supreme Court
has repeated time and again.

### 1. A TRANSCRIPT OR OTHER RECORD OF THE TRIAL PROCEEDINGS

In a scenario with trial counsel raising a motion
under MCR 6.005(H)(4), it does not appear that, as
things currently stand, a record would yet have been
prepared. Indeed, generally, preparation of the record
commences concurrently with the request for appel-
late counsel and the defendant's assertion of his
desire to appeal, something that trial counsel is with-
out authorization in the court rules to do. Trial coun-
sel would, expectedly, have notes of the proceedings.
Given that our current scheme for preparing tran-

scripts could be altered to accommodate this situation, I will forgo any substantial discussion of whether counsel's notes alone would amount to an adequate substitute for a record. The remaining factors are more determinative. Notably, however, *Douglas* and *Ross* both referred to appellate counsel searching the record for hidden errors and issues. As further discussed below, however, counsel's notes, by definition, would not contain any "hidden" errors or issues. If trial counsel noticed errors, we would expect that these concerns would be raised promptly rather than on appeal. In fact, we would require them to be raised, and prohibit attempts to use them as an "appellate parachute."

### 2. A BRIEF ON HIS BEHALF IN THE COURT OF APPEALS SETTING FORTH HIS CLAIMS OF ERROR

According to the majority, trial counsel will bring a motion to withdraw the plea under MCR 6.311. Part of this argument is that MCR 6.311(C) requires preservation of issues concerning guilty pleas by means of a motion to withdraw the plea. Thus, as a necessary antecedent to any such issues being raised on appeal, trial counsel will presumably have filed a motion below, identifying and arguing the issue.

Leaving aside this presumption's correctness, for the purposes of this component of the *Ross* analysis, the motion must be compared to the presence of an existing appellate brief that offers a pro se defendant a springboard from which to launch his own efforts. First, generally, appellate briefs are considerably more in-depth and detailed than briefs to the trial court. The time demands of appellate practice, though

strict, are nonetheless often much more inducive to comprehensive briefing than are trial court schedules.

More important, however, is that a great many issues need not be preserved by a MCR 6.311 motion in the trial court to be raised on appeal. Indeed, MCR 6.311(C) itself requires preservation of only certain issues:

> Preservation of Issues. A defendant convicted on the basis of a plea may not raise on appeal any claim of noncompliance with the requirement of the rules in this subchapter, or any other claim that the plea was not an understanding, voluntary, or accurate one, unless the defendant has moved to withdraw the plea in the trial court, raising as a basis for withdrawal the claim sought to be raised on appeal.

Thus, only issues dealing with what might be termed the facial validity of the plea require such a motion for their preservation. Many other issues, including a great many of the claims that are not waived by a guilty plea, like jurisdictional defects, double jeopardy claims requiring no further factual record, due process claims, preserved entrapment claims, mental competency claims, claims involving the factual basis of the plea, and claims that the state had no right to proceed in the first instance, might also be raised in plea cases. Although some of these claims, like factual basis challenges, would seem to require preservation, others, like jurisdictional defects and double jeopardy claims, the latter being a particularly complex area of law to a layperson, clearly would not.

Additionally, neither the majority's theory nor MCR 6.311 addresses many other potential claims that might arise in a guilty plea case. Rare indeed would

be the instances when trial counsel would suggest that they themselves provided ineffective assistance during the plea proceedings. More frequently, however, sentencing issues arise, whether of the type less frequently granted relief, like claims based on *Milbourn, supra,*[38] or of the type often granted relief, like illegal sentences, including consecutive sentences imposed without statutory authorization.

It may be suggested, however, that even in the absence of MCR 6.311's requirement that such issues be raised, MCR 6.005(H)(4) mandates such claims being brought by trial counsel, but that is not the case. MCR 6.005(H)(4) provides:

> Scope of Trial Lawyer's Responsibilities. The responsibilities of the trial lawyer appointed to represent the defendant include
>
> \* \* \*
>
> (4) unless an appellate lawyer has been appointed, filing of postconviction motions the lawyer deems appropriate, including motions for new trial, for a directed verdict of acquittal, to withdraw [the] plea, or for resentencing.

Thus, trial counsel may file such motions as "the lawyer deems appropriate." What would be appropriate, however, is something of an open question. The staff comment to this rule offers some insight into the phrase's genesis:

> Subrule (H) expands the scope of an appointed trial lawyer's responsibilities set forth in former 6.101(C)(2). The former rule made no reference to an appointed trial attorney's ability to file "postconviction motions the lawyer

---

[38] Even though these claims are sometimes granted relief as well, as illustrated by *Antolovich, supra.*

deems appropriate." Clearly, there are circumstances when it is more appropriate for the trial attorney to seek postconviction relief for his client than to await the appointment of appellate counsel. Under the scheme of the rules, however, a defendant should have only one appointed lawyer representing him at any time, and consequently, the appointment of appellate counsel should act as an end to the responsibilities of the trial attorney under the appointment order.

Until now, under this rule, trial counsel has had the authority to file motions until the appointment of appellate counsel. Under the majority's decision, however, appellate counsel will not be forthcoming. Accordingly, construing the rules in such a fashion that trial counsel would become the only standardbearer for postconviction motions would entail an extension of the defendant-trial counsel relationship. The traditional end of that relationship was the appointment of appellate counsel, usually following and pursuant to the defendant's execution of the State Court Administrator's Office form given to defendant at sentencing. However, the majority's decision would extend this relationship for a time, matching the time for filing an application for leave to appeal, which is, under MCR 6.311(A), the time when a defendant may file a motion to withdraw a plea. Given the various scenarios possible under MCR 7.205(F) for filing a delayed application for leave to appeal, a defendant-trial counsel relationship could last up to, and in some cases beyond, twelve months following sentencing.

This is not, in and of itself, offered as a reason to reject the MCR 6.005(H)(4) hypothesis under *Ross*. Rather, this detour is necessary to fully appreciate the magnitude of the disparity between the situation as it currently exists in our trial courts, and the situation

as it will be beginning today under the majority's decision.

Likewise, before moving on, our minimum standards for appellate counsel for indigent defendants are instructive. In particular, standard nine states:

> Counsel should assert claims of error which are supported by facts of record, which will benefit the defendant if successful, which possess arguable legal merit, and which should be recognizable by a practitioner familiar with criminal law and procedure who engages in diligent legal research. [Administrative Order No. 1981-7.]

Although we have held that failure to raise every claim of arguable legal merit does not amount to ineffective assistance, see *People v Reed*, 449 Mich 375; 535 NW2d 496 (1995), we have, nonetheless, expected counsel functioning in an appellate role to raise those claims that might arguably have merit. In place of this requirement, under the majority's decision, we have MCR 6.005(H)(4)'s language giving the trial attorney responsibility for filing those motions that "the lawyer deems appropriate." We could, were we to read or add language into the rule beyond its current text, suggest that such an evaluation of appropriateness might involve the same sort of considerations embodied in standard nine above, rather than the sort of considerations implied in the staff comment's discussion. The staff comments suggest that appropriateness entails considerations like delaying filing a motion until the appointment of appellate counsel, and passage of the requisite time for counsel to get up to speed on the issues. Were we to change the rule as discussed, however, several issues would arise.

As an initial matter, we should expect that counsel's notes will not have any errors that might be called "hidden." Indeed, if counsel believed that an error had occurred, we expect and require a contemporaneous objection. Accordingly, the idea that trial counsel will be searching through notes for hidden errors that might evade the pro se indigent defendant is a myth. If any such errors occurred, they remained hidden because trial counsel was unaware of them, and thus did not find the incident noteworthy.

It may be that, if the indigent himself has chosen to file an application for leave to appeal, which is beyond the scope of trial counsel's responsibilities, a transcript may be prepared. If we were to extend the client's relationship with trial counsel well past sentencing, to the outer limits of the time for filing a delayed application for appeal, counsel might have a record to review. Again, though, counsel would be reviewing their own work, and, although something new might occur to them, it might as easily go unnoticed. The more the latter would occur, the greater the potential for an ineffective assistance claim, and yet the slimmer the chances of it being noticed by the pro se defendant or the appellate court.

Finally, the content of the "lawyerly presentation" deserves comment. As noted above, there is not much potential to dispute the suggestion that generally, briefs presented by counsel to the Court of Appeals are considerably more comprehensive than briefs that may, but often need not, accompany trial court motions. Moreover, given that these motions are offered to the trial court, they may well have a distinctly trial court direction. Rather than denigrating the trial court's function, the underlying point of this suggestion is that many factual concerns may be

appropriately addressed to the trial court. If such an offering forms the only basis for a claim to an appellate court, however, we would expect the appellate court to defer to the lower court's factual findings. This becomes a particular concern with guidelines scoring issues, when factual decisions often underlie the scoring, and yet, under our new system, the Legislature has mandated the availability of appellate review. Experienced counsel might well primarily attack the findings of fact supporting a score before the trial court, and yet shift focus to any preserved legal challenge on appeal. An indigent defendant with only a trial court presentation in his repertoire, however, will be handicapped by having only one pitch to offer, one well outside the narrowed appellate strike zone.

Thus, the comparison between a defendant with the benefits of an MCR 6.005(H)(4) brief from trial counsel and the *Ross* pro se defendant, who had an appellate brief on his behalf, is unavailing. Although both might, in some sense, have a lawyer offering some of their claims, the usefulness and applicability of such efforts to appellate access, the key determination to compliance with *Ross*, is simply lacking. Even more lacking, however, is the next factor.

### 3. AN OPINION BY THE COURT OF APPEALS DISPOSING OF HIS CASE

The appellate court's decision, though not present in every case, as *Ross* recognized, nonetheless offers a key tool toward subsequent appellate access. This Court knows this to be true, because a substantial failing of more than a few of the applications to this Court is a failure to address the conclusion of the

Court of Appeals. Under MCR 6.005(H)(4), however, two basic components will be absent.

First, though less important, the press of trial court business means that postconviction motions may well have little, if any, opinion offered with that court's decision. Indeed, we see some such motions denied simply by checking a box on an scao or local form, with no further explanation. The record may or may not contain some sort of discussion, but in general, even when written opinions are offered, they may not be particularly in depth.

More importantly, however, is what trial court opinions are not. Although such opinions are most likely not appellate opinions in terms of their content, they are certainly not appellate opinions in terms of their authorship. The very same court that is purported to have made the error is ruling on the motion. The motion may address an issue preserved by objection, and thus the court would have already ruled on the alleged error. In other instances the motion may raise a new issue. Every instance, though, will involve an allegation of error by the same court asked to decide whether there was error.

As a matter of first instance, courts may address claims of their own error. A trial court correcting its own errors when it finds merit in a party's contention, however, can hardly be said to amount to an appellate decision. Rather, it is more likely a re-decision of the same point. Consider, for example, motions for reconsideration before this Court. When a party offers nothing new, but simply alleges that the prior decision was incorrect, even for new and expanded reasons, we tend to offer them short shrift. Much the same would occur below. In Proposal B cases, then, rather than a scenario comparable to the constitution-

ally acceptable situation in *Ross*, which involved appellate counsel presenting appellate arguments to an appellate court, Michigan will have trial counsel presenting trial-level arguments to the same trial court that is alleged to have made the error, when that court has already decided the issue to its satisfaction in the first instance.

### 4. MCR 6.005(H)(4) AND *ROSS*

As detailed above, the *Ross* Court relied on three particular antecedents when it denied counsel to a defendant seeking a discretionary appeal after a first appeal where counsel was present. In decisions after *Ross*, the Supreme Court and lower courts have compared the tools defendants have had to those present in *Ross* when deciding whether to appoint counsel. If the tools are not comparable to those present in *Ross*, then the cases have been deemed more comparable to *Douglas*, and counsel has been appointed.[39] See, e.g., *Mata, supra.*

The first of these tools was a transcript of the proceedings below. As discussed above, this tool will not be present under the MCR 6.005(H)(4) scenario.

Next, *Ross* relied on the presence of an appellate brief prepared by appellate counsel for the defendant. Indigent Proposal B defendants, who will have to rely

---

[39] On the other hand, when defendants have had the tools present in *Ross*, the Court has concluded that the constitutional requirement has been fulfilled and counsel has not been appointed. See, e.g., *Finley, supra.* The majority refers to this as the Supreme Court's "contracting" right-to-counsel jurisprudence. *Ante* at 520. However, the constitutional standard has remained constant; the Court has adhered to its decision in *Ross.* By mere happenstance, the Court has not been presented with cases in violation of *Ross*, because most states have provided indigent defendants with counsel rather than denying counsel in a reach for new constitutional lows. See, e.g., *Billotti, supra.*

on MCR 6.005(H)(4) under the majority's decision, will have only a trial-level motion, perhaps with a memorandum of law, prepared by trial counsel, offering trial court arguments to the same trial court alleged to have erred. Though the trial court motion is something to point to under MCR 6.005(H)(4), the comparison to *Ross* is unavailing.

Finally, *Ross* relied on the presence of an appellate opinion. *Ross* involved an appellate court, presumably the objective higher level of review, reviewing the arguments, researching the issues, and making conclusions of law on the basis of an objective assessment by those sitting on the panel. Under *Ross*, before an indigent defendant would be left to seek discretionary appellate review on his own, his case would have been passed on by a higher court wholly removed from the initial decision and, for that matter, one given the benefit of an attorney's presentation on his behalf. That court would have rendered a considered decision, offering to him a neutral assessment of the merits and viability of his claims of error. Under MCR 6.005(H)(4), an indigent defendant gets a trial-level decision, perhaps without any citation or explanation of any applicable authority, by the same judge in whom deficiency was alleged.

When analyzing claims for counsel, the Supreme Court has repeatedly turned to this analysis under *Ross*. Indigent Proposal B defendants will have nothing comparable to the tools the defendant had in *Ross*, leaving them to have only a meaningless ritual rather than a meaningful appeal. Further, as explained above, the "simplicity" of guilty plea cases does not mitigate the stark contrast between indigent Proposal B defendants and the defendant in *Ross*, as indigent Proposal B defendants can bring a variety of

complex claims on appeal. The majority acknowledges that an indigent Proposal B defendant's tools "are not equivalent" to those present in *Ross*, but that acknowledgment is akin to an acknowledgment that the Titanic had some difficulty staying afloat. Under the majority's decision, the instant defendant, and every indigent Proposal B defendant, has nothing like the tools present in *Ross*. Instead, they have a meaningless ritual.

III

In closing, I cannot dispute that appellate justice, whether for indigents or otherwise, carries an attendant cost in dollars.[40] This, along with a desire to eliminate a backlog of appellate cases in our Court of Appeals, led to the adoption of Proposal B.[41] Further, for many it is easy to disregard indigent defendants' appeals because "[w]e all know that the overwhelming percentage of in forma pauperis appeals are frivolous." *Douglas, supra* at 358 (Clark, J., dissenting).

---

[40] I pause for the benefit of those who might be unfamiliar with the Michigan appellate system to point out the manner in which indigent defendants are represented on appeal. The State Appellate Defender Office represents defendants in approximately twenty-five percent of the total number of indigent appellate cases in the state. See MCL 780.716; MSA 28.1114(106). The remaining cases are assigned to private attorneys by means of a roster system administered by the Michigan Appellate Assigned Counsel System (MAACS). Although state defenders have salaried positions, those attorneys on the MAACS roster are paid a fee per case that is determined by the county where the conviction originates, with such fees varying statewide.

[41] See note, *Limiting Michigan's guilty and nolo contendere plea appeals*, 73 U Det Mercy L R 431, 448-449 (1996), for a comprehensive discussion of the genesis of Proposal B, along with a knowing caution that, although the proposal itself did not address the right to counsel, there would be those who would argue that it somehow obliterated that right in guilty plea cases.

None of these considerations, however, provides the slightest justification to deny indigent guilty-pleading defendants their constitutional protections. Appellate counsel has consistently been provided as a basic constitutional protection for those who cannot afford to pay for the services of an attorney. As our Supreme Court stated:

> The need for forceful advocacy does not come to an abrupt halt as the legal proceeding moves from the trial to appellate stage. Both stages of the prosecution, although perhaps involving unique legal skills, require careful advocacy to ensure that rights are not forgone and that substantial legal and factual arguments are not inadvertently passed over. [*Penson, supra* at 85.]

> To prosecute the appeal, a criminal appellant must face an adversary proceeding that—like a trial—is governed by intricate rules that to a layperson would be hopelessly forbidding. An unrepresented appellant—like an unrepresented defendant at trial—is unable to protect the vital interests at stake. [*Evitts, supra* at 396.]

Further, with regard to indigent defendants, I again consult the wisdom of our nation's final arbiter of constitutional protections:

> Statistics compiled in the court below illustrate the undeniable fact that as many meritorious criminal cases come before that court through applications for leave to proceed in forma pauperis as on the paid docket, and that no *a priori* justification can be found for considering them, as a class, to be more frivolous than those in which costs have been paid. Even-handed administration of the criminal law demands that these cases be given no less consideration than others on the courts' dockets. Particularly since litigants in forma pauperis may, in the trial court, have suffered disadvantages in the defense of their cases inherent in their impecunious condition, is appellate review of their cases any less searching than that accorded paid appeals

inappropriate. *Indigents' appeals from criminal convictions cannot be used as a convenient valve for reducing the pressures of work on the courts. If there are those who insist on pursuing frivolous litigation, the courts are not powerless to dismiss or otherwise discourage it. But if frivolous litigation exists, we are not persuaded that it is concentrated in this narrow, yet vital, area of judicial duty.* [*Coppedge v United States*, 369 US 438, 449-450; 82 S Ct 917; 8 L Ed 2d 21 (1962) (emphasis added).]

This Court's decision leaves indigent defendants standing in a cloud of dust on the roadside on the way to appellate justice. Defendants who can pay for the services of an attorney will be represented at trial level, will have their cases reviewed by appellate attorneys, and will have lawyerlike presentations to our Court of Appeals. In other words, they will have meaningful appeals. Defendants who cannot pay for an attorney will have trial level representation, and will be left without any appellate representation whatsoever. The only thing more that they will have is the meaningless ritual in our Court of Appeals.

KELLY, J., concurred with CAVANAGH, J.

MARKMAN, J., took no part in the decision of this case.